623 A.2d 198

William ANDERSON

v.

**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES et al.**

No. 115, Sept. Term, 1992.

Court of Appeals of Maryland.

April 23, 1993.

188

Joel A. Smith (Christyne L. Neff, Kahn, Smith and Collins, P.A., on brief), Baltimore, for appellant.

Edward R.K. Hargadon, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Susan L. Howe, Asst. Atty. Gen., on brief), Glen Burnie, for appellee.

Argued before ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ., and CHARLES E. ORTH, Jr. Associate Judge of the Court of Appeals (retired) Specially Assigned.

CHARLES E. ORTH, Jr., Judge, Specially Assigned.

We are asked on this appeal whether, upon judicial scrutiny, the administrative removal of William Henry Anderson, Jr. from State service was legally justified.

## BACKGROUND

Anderson had been an employee of the Department of Correction (DOC) for a decade when he was fired. His entire tenure had been spent in a security environment, the last nine years as a correctional guard in the South Wing Segregation Unit of the Maryland Penitentiary which housed the most violent and uncooperative inmates. He had attained the rank of Sergeant and the classification of Correctional Officer III. He was suspended by the DOC pending charges for his removal for allegedly using excessive force on an inmate, Glen Wooden. Formal charges against him were filed by the Warden of the Maryland Penitentiary and the charges were approved by the Department of Public Safety and Correctional Services. At a preliminary hearing he was barred from the worksite, so his suspension was without pay. He was notified of the charges by the Department of Personnel (DOP).

The DOP was "created as a principal department of the State government" by Md.Code (1957, 1990 Repl.Vol.) Art. 41, § 9–101(a). The head of the Department is the Secretary of Personnel (SOP). *Id.*

> The [SOP] shall be responsible for promulgating rules and regulations for his office. He shall review and shall have the power to approve or disapprove or revise the

rules and regulations of all of the boards, offices and agencies within the jurisdiction of the [DOP].

Art. 41, § 9–105(b).

The SOP is also the head of the State Merit System. Md.Code (1957, 1988 Repl.Vol.) Art. 64A.

All employees of the Maryland Penitentiary ... shall be included in the classified service and subject to all of the provisions of [Art. 64A].

Art. 64A, § 2. "It shall be the duty of the [SOP] to carry out the provisions of [Art. 64A], and to make such rules as he deems necessary or proper to that end." Art. 64A, § 11. Art. 64A, § 33(d)(1) provides:

The [SOP] shall, by rule, prescribe what may constitute cause for removal, but no removal shall be allowed because of the religious or political opinions or affiliations of any employee.

As required, the SOP has promulgated rules and regulations. They are published in the Code of Maryland Regulations (COMAR). COMAR 06.01.01.61A permits a classified employee against whom charges have been filed to submit a written appeal to the Office of Administrative Hearings (OAH).

The OAH was established by act of the General Assembly in 1989 and was codified in the Md.Code (1984) as Title 9, subtitle 16 of the State Government article (SG). The OAH is "an independent unit in the Executive Branch of State government," SG § 9–1602, headed by a Chief Administrative Law Judge, SG § 9–1603(a). The SOP may designate an official whose duties and responsibilities are unrelated to the hearing process to conduct a hearing in contested removal cases. Art. 64A, § 36A(c)(3).

The OAH statute must be read in tandem with the contested cases provisions of the Administrative Procedure Act (APA), formerly codified in Md.Code (1957), Art. 41. In 1984 the provisions of the APA were transferred to the new State Government article as Title 10, subtitle 2, in revised language but without substantive change. In 1989 the

APA was amended to accommodate the provisions of the OAH statute. An agency may "delegate to the [OAH] the authority that the agency ... has to hear particular contested cases," SG § 10–207(a)(1), and "may delegate to [the OAH] the authority to issue the final administrative decision of the agency in a contested case," SG § 10–207(a)(2). Section 10–207(b) spells out the duties of the OAH. It shall:

(1) conduct the hearing; and

(2) submit in writing to the parties involved in the administrative action ...:

(i) proposed findings of fact and proposed conclusions of law; or

(ii) if the agency has delegated the authority to issue a final decision to the [OAH], final findings of fact and conclusions of law.

The Chief Administrative Law Judge may designate an Administrative Law Judge (ALJ) "to conduct hearings in contested cases." SG § 9–1604(a)(4). "In any contested case conducted by an [ALJ], the [ALJ] may"

(1) authorize the issuance of subpoenas for witnesses;

(2) administer oaths;

(3) examine an individual under oath; and

(4) compel the production of documents or other tangible things.

SG § 9–1605(c). Inasmuch as an agency may delegate to the OAH "the authority that the agency ... has to hear particular contested cases," the ALJ is told by the APA through authority granted an agency how the hearing is to be conducted. SG §§ 10–208 and 10–209 speak with particularity of the evidence which may be offered and considered. Translating the authority of the agency to the ALJ, SG § 10–210 dictates that the ALJ shall make a record that includes:

(1) all motions and pleadings;

(2) all documentary evidence that the agency receives;

(3) a statement of each fact of which the agency has taken official notice;

(4) any staff memorandum submitted to an individual who is involved in the decision making process of the contested case by an official or employee of the agency who is not authorized to participate in the decision making process;

(5) each question;

(6) each offer of proof;

(7) each objection and the ruling on the objection;

(8) each finding of fact or conclusion of law proposed by:

 (i) a party; or

 (ii) a hearing officer;

(9) each exception to a finding or conclusion proposed by a hearing officer; and

(10) each intermediate proposed and final ruling by or for the agency, including each report or opinion issued in connection with the ruling.

Unless the agency has authorized the ALJ to make a final decision, the ALJ may only propose a decision which is subject to review by the agency which then renders the final decision. "The finding and decision of the [SOP] ... shall be final, and shall be certified to the appointing authority and shall forthwith be enforced by such authority." Md.Code, Art. 64A, § 33(c). SG § 10–214(a) requires that "[a] final decision or order in a contested case that is adverse to a party shall be in writing or stated on the record." Subsection (b) concerns the contents of the decision. In relevant part, it provides:

(1) A final decision in a contested case shall contain separate statements of:

 (i) the findings of fact; and

 (ii) the conclusions of law.

(2) If the findings of fact are stated in statutory language, the final decision shall state concisely and explicitly the facts that support the findings.

In the case before us, the SOP as the head of the DOP delegated to the OAH only the authority to conduct the hearing on the charges and to propose a decision. The ALJ

assigned to conduct the hearing proposed that Anderson be reinstated to State service. The Penitentiary filed exceptions to the proposed decision, and the SOP appointed a designee to conduct a hearing to review the proposed decision of the ALJ. The designee renounced the decision of the ALJ. She ordered that Anderson be separated from state service. Anderson appealed the order to the Circuit Court for Baltimore City as authorized by SG § 10–215. The court affirmed the order of the designee for the SOP. *See* SG § 10–215(g)(2). Anderson looked to Court of Special Appeals pursuant to § 10–216(b). *See* Md.Rule B2. We ordered the issuance of a writ of certiorari on our own motion before decision by the intermediate appellate court.

Thus it is that the case has wended its way to this Court through the maze of administrative proceedings for the contested removal of a classified employee from State service. There has been complete compliance with the procedural particularities of the gaggle of statutes, rules and regulations; there is no claim of a procedural irregularity. So what is before us is the propriety of the affirmance by the Circuit Court for Baltimore City of the final order of the SOP which cost Anderson his job.

### THE CHARGES

Md.Code, Art. 64A, § 33(b)(2)(i) commands:

No employee who has completed his probation may be permanently removed from the classified service except for cause, upon written charges and after an opportunity to be heard in his own defense.

The Division of Correction (DOC) was established by § 4–105(a) of Art. 41 of the Maryland Code as a part of the Department of Public Safety and Correctional Services. Md.Code (1957, 1992 Repl.Vol., 1992 Cum Supp.), Art. 27, § 673 creates the office of the Commissioner of Correction (COC). The COC "is in sole and active charge of the [DOC] and of its several institutions and agencies, subject only to his responsibility to the Secretary of Public Safety and

Correctional Services and to the Governor." *Art. 27, § 674.* The COC is empowered to adopt and promulgate "reasonable rules and regulations" including those providing for the duties, discipline and conduct of officers and employees of the several institutions and agencies [in the DOC]. Art. 27, § 676. The Maryland Penitentiary is one of those institutions.

Anderson was charged with violating a rule of COMAR, four regulations of the DOC (DCRs),[1] and a Post Order of the Maryland Penitentiary, as follows:

(1) COMAR 06.01.01.47 paragraphs B, D, L and M;

(2) DCR 50–2 IV.A.4, 19a. and 25;

(3) DCR 50–6 VI.A;

(4) DCR 50–54 V. and VI.;

(5) DCR 110–23 IV.A;

(6) Post Order 12 VI.N.5.

(1) The SOP prescribed "Causes for Removal" in COMAR 06.01.01.47. It declares:

Any employee in the classified service may be permanently removed from his position only for cause and, except in the case of rejection on probation, only upon written charges and after an opportunity to be heard in his own defense, and not because of his religious or political opinions or affiliations or for refusing to contribute to a political fund or render political services. The following shall be sufficient cause of removal, though removal may be for causes other than those enumerated:

Paragraph B provides:

That the employee has been wantonly careless or negligent in the performance of his duty or has used unwar-

---

1. Some of the Division of Correction's regulations currently in effect differ, at least in designation, from those on the books when the incident before us took place. For example, DCR 50–2 has since grown into a 71–page pamphlet of its own encompassing, among others, DCRs 50–6 and 50–54. Our discussion, of course, concerns the DCRs as they were on January 15, 1991.

ranted or excessive force in his treatment of public charges, fellow employees, or other persons;

Paragraph D provides:

That the employee has violated any lawful official regulation or order or failed to obey any lawful and reasonable direction given by his superior officer when the violation or failure to obey amounts to insubordination or serious breach of discipline which may reasonably be expected to result in a lower morale in the organization or to result in loss or injury to the State or the public;

Paragraph L provides:

That the employee has willfully made a false official statement or report;

Paragraph M provides:

That the employee has been guilty of conduct such as to bring the classified service into public disrepute;

(2) DCR 50–2 IV is titled "Procedures."

Section A warns:

All employees of the Division must abide by the following rules of conduct established by the Commissioner. All new employees must read this regulation within 24 hours after reporting for duty. All employees will review this regulation at least annually. Violations of this regulation and the stated rules of conduct, whether through ignorance, carelessness, or willful action, will be considered grounds for disciplinary action, possible criminal action, and/or removal from State Service.

Subsection 4 ("Personal Conduct") commands:

Every employee shall conduct him or herself at all times, both on and off duty, in such a manner as to reflect most favorably on the Division of Correction. Conduct unbecoming an employee shall include that which tends to bring the Division of Correction into disrepute, or reflects discredit upon the employee as a representative of the Division, or that which tends to impair the operation or efficiency of the agency or employee.

Subsection 19 ("Performance of Duties") provides in paragraph a:

Employees are to perform their duties diligently and efficiently. Indifference, carelessness or negligence will constitute grounds for disciplinary action.

Subsection 25 ("Reports") cautions:

Reports submitted by employees must be clear, concise, factual and accurate. Any report, written or oral, which contains an intentional false statement, omission or misstatement of fact will be considered grounds for disciplinary action.

(3) DCR 50–6 VI is headed "Procedure."

Section A reads:

Staff having direct responsibility for custody of inmates, when found to be inattentive, careless or negligent in the performance of their duties which contributes to or results in a breach of security, escape, harm to an inmate, employee or the general public by an inmate, shall be disciplined as follows:

1. First occasion within the current reckoning period— Suspension for 15 days.

2. Second occasion with the current reckoning period— Discharge from State Service.

(4) DCR 50–54 V, under the title "Policy," declares:

The use of force is to be resorted to only after reasonable non-force solutions have failed and only to the extent necessary to control the situation. Any use of force shall be applied in compliance with DCR 110–23.

Section VI is headed "Procedure." Although the charges do not specify which of the five subsections are intended, they do characterize the violation as "Use of Force," and it appears that subsection A is applicable. It states:

Excessive or unnecessary force used against an inmate, or any other action by an employee which results in serious bodily harm, death or a serious breach of the security of the institution, its staff, inmates, or the general public, or which has the potential for such results, shall

result in the filing of Charges for Removal from State service.

(5) DCR 110–23 IV does not prescribe a violation; it only gives the definitions of "Non-deadly Force," "Deadly Force," and "Chemical Agents." Section V, however, titled "Policy and Procedure," states in subsection A:

The use of force is to be resorted to only after reasonable non-forceful solutions have failed and then only to the extent necessary to control the situation.

The violation as it appears in the statement of charges as § IV is characterized as "Use of Force."

(6) Post Order 12 is applicable to the Maryland Penitentiary Correctional Staff. Section II. Its purpose is "[t]o provide a guide to assist officers assigned to the [South Wing]." Section III. "Special Remarks" are stated in § IV:

South Wing is a housing unit consisting of inmates assigned to segregation, protective custody, and general population. Extreme caution and strict adherence to procedures should be exercised at all times.... Proper procedures will be adhered to during the movement of inmates housed in this unit.

"Procedure" is the subject of § VI. It seems that the incident occurred when Wooden was to be removed from his cell to take a shower. After compliance with certain preliminary precautions and when an inmate is about to leave the cell to be escorted to the shower room, paragraph N.5 directs:

The inmate will then be instructed to face the back wall, place his hands behind his back and position himself to be handcuffed when the door is opened. The door will be opened only enough to allow the assisting officer ample space to place handcuffs on the inmate. After being handcuffed, the inmate will be allowed to exit the cell, wearing his shorts and shower shoes.

Post Order 12 is not published generally; it is available only to the Maryland Penitentiary personnel.

## THE HEARING BEFORE THE ADMINISTRATIVE LAW JUDGE

Eleven witnesses testified at the hearing conducted by the ALJ and 24 exhibits were presented; the transcript of the proceeding consumes 551 pages. The proposed recommendation of the ALJ listed 31 facts which he found by a preponderance of the evidence "[b]ased on the testimony of witnesses, exhibits submitted at the hearing and documents entered into the record after the hearing." We set them out verbatim:

1. On January 15, 1991, Sgt. William Anderson was the shift Officer in Charge (OIC) on the South Wing of the Maryland Penitentiary.

2. Sgt. Anderson was required to make two security check rounds of the South Wing during his shift.

3. During the course of the morning round, Sgt. Anderson saw an inmate being handcuffed outside of his cell which he believed was a violation of Post Order 12 and a possible breach of security.

4. Sgt. Anderson approached the cell at a rapid pace and saw Correctional Officers Brenda Dorsey and Henry Brandon with inmate Glen Wooden.

5. Officers Dorsey and Brandon had been employed by the Division of Correction for two years and ten months respectively compared with Sgt. Anderson's ten years.

6. Upon reaching the cell, Sgt. Anderson noticed that Officer Dorsey was attempting to complete handcuffing the inmate in the front by placing one cuff on the wrist and the other on a crutch.

7. Sgt. Anderson ordered the inmate to return to his cell immediately in an effort to restore compliance with Post Order 12.

8. Inmate Wooden initiated an argument with Sgt. Anderson and verbally and physically resisted the order to return into his cell.

9. The inmate told Sgt. Anderson that he was a short timer and would get him when he got uptown. This statement was clearly a threat.

10. The inmate had a history of verbal and physical assaultive behavior.

11. With minor physical pressure, the inmate backed partially into his cell, faced outward and held the crutch by the lower shaft.

12. Officer Dorsey was between Sgt. Anderson and the inmate and facing the inmate.

13. Officer Dorsey was trying to correct the handcuffing of the inmate when he (the inmate) raised the crutch as if to swing it and hit her.

14. Sgt. Anderson responded to this threat by raising his forearm to divert the blow and grabbed the crutch.

15. Sgt. Anderson interposed himself between the inmate and Officer Dorsey to prevent her injury.

16. The inmate refused to respond to Sgt. Anderson's orders to cease struggling and let go of the crutch. They grappled for the crutch and with each other.

17. During the course of this struggle, Sgt. Anderson and the inmate hit the wall of the cell several times, then the bed and finally rolled onto the floor.

18. Sgt. Anderson lay on top of the inmate pinning his arms to prevent being hit; the inmate intertwined his legs with Sgt. Anderson's and both were unable to break the hold of the other.

19. When the scuffle began, Officer Dorsey took the keys from Officer Brandon, closed the cell door and went to call in a "Signal 13" indicating an officer was in confrontation with an inmate.

20. Officer Brandon remained on the scene but did not assist Sgt. Anderson in subduing and containing the inmate.

21. A response team, including Lt. Wouldridge, came to the cell pursuant to the Signal 13 call.

22. Lt. Wouldridge unlocked the cell door, entered and observed Sgt. Anderson and the inmate in the position described in Finding 19 above.

23. Lt. Wouldridge directed Sgt. Anderson to stand up who then stated he could not because of the intertwinement of his and the inmate's legs.

24. Sgt. Anderson did stand up after a response team member untangled their legs.

25. Lt. Wouldridge escorted the inmate to the inmate inhouse medical facility for treatment of his abrasions and other internal injuries.

26. The inmate's abrasions and dermal injuries could have been easily caused by the use of minimal force.

27. On January 16, 1991, Sgt. Anderson reported to work with a swollen arm, abrasions, bruises and lacerations, which caused him to seek medical treatment.... He did not report back to work until January 18, 1991.

28. All required incidents and use of force reports were properly filed by participants and observers who were on site at the time of the incident.

29. The variations in these reports resulted from the difference in recollections of the writers rather than any intent to falsify an official report.

30. Sgt. Anderson was rated overall satisfactory in his annual efficiency rating reports for 1989 and 1990 and superior in the 1988 report.

31. On January 16, 1991, Sgt. Anderson was suspended pending charges for removal.

The ALJ did not address the alleged COMAR violation but he discussed each of the DCRs charged. As to DCR 50–2 IV.A.4, he said:

The facts educed at the hearing do not show that Sgt. Anderson acted in a manner bringing disrepute or discredit upon the Division or himself. They do show his action reduced greatly the actual and/or probable risk of a breach of security when he came upon Officers Dorsey and Brandon attempting to handcuff the inmate outside

his cell while holding a dangerous instrument (crutch). Sgt. Anderson reacted instantly to [a] dangerous situation. He intended to restore conditions to those required by DCRs and Post Orders. His response reflected favorably on the Division without discredit or disrepute.

As to paragraph 19a., he observed:

The facts show that Sgt. Anderson acted immediately to restore proper security with the least possible harm to himself, fellow officers and the inmate as warranted by the situation. Sgt. Anderson did not act in violation of Paragraph 19a.

As to paragraph 25, he stated:

The facts in this case do not reveal any intentional falsity, omission or misstatement in the required reports. They do show that the variations in the reports arose from natural differences in the recollection of witnesses and participants involved in a traumatic incident. I conclude that Sgt. Anderson did not act in violation of Paragraph 25.

On the charge under DCR 50–6 IV.A, he said:

In this case, Sgt. Anderson came upon a situation that was dangerous and a breach of security. The facts show he acted immediately to restore safety, security and order. Such steps cannot be characterized as negligent, careless or inattentive. Thus, I conclude he did not violate this regulation.

He discussed DCR 50–54 V and VI:

Sgt. Anderson repeatedly ordered the inmate to return to his cell and only resorted to force after the inmate verbally and physically refused to comply with those orders. Reasonable force was also used by Sgt. Anderson when he saw the inmate raise a weapon (crutch) to strike Officer Dorsey who stood between them. Sgt. Anderson's attempt to wrest the crutch from the inmate resulted in their scuffling, hitting the wall, bed and floor. In a matter of seconds they came to rest in a position where neither party could hit the other and

the inmate had Sgt. Anderson's legs entangled so that he could not stand up.

Sgt. Anderson acted immediately to protect Officer Dorsey from a blow from the crutch; his swollen forearm attests to his taking the blow himself. The standoff existing when Sgt. Anderson and the inmate immobilized each other was not a display of excessive or unnecessary force. It was an example of the use of minimum force to contain/control a dangerous situation. Sgt. Anderson's actions in this situation do not constitute the use of excessive or unnecessary force.

It might be argued that since the inmate was inside the cell, Sgt. Anderson could have retreated from the cell, locked the door and waited for the inmate to surrender the crutch; that was not possible here. The inmate initiated a course of verbal and physical threats, Officer Dorsey was inside the cell and preoccupied with resolving the handcuffing of the inmate. Finally, the use of no force was precluded when the inmate raised the crutch in an apparent attempt to strike Officer Dorsey.

The ALJ correctly noted that DCR 110–23 IV.A. does not prescribe a violation; it merely defines certain terms. Therefore, the ALJ dismissed that charge. But, he said:

If it is assumed for the sake of argument that the agency intended to refer to Section V, then the same discussion and conclusion set forth under DCR No. 50–54 above is also applicable here; i.e., Sgt. Anderson did not use excessive force.

As far as we can ascertain from the record that was submitted to us, the charge was not amended to show that a violation of § V.A was the intended charge.

Regarding Post Order 12, the ALJ declared:

The facts in this case show that Officers Dorsey and Brandon were not following proper procedures in handcuffing the inmate for his shower. Sgt. Anderson recognized this fact and immediately attempted to restore the

proper conditions of security with the minimum force necessary.

He noted: "The regulation does not speak to any accommodations for the inmate's use of a crutch." He pointed out:

The evidence shows that medical authority to use a crutch does not alter basic security procedures if interpreted with a touch of common sense. The Acting Assistant Warden Sanders testified to the above and that if the inmate made a gesture with the crutch, it was completely proper for the Officer to take it from him.

We think that the ALJ covered the COMAR violation even though he did not expressly discuss it.

Based on his findings of fact as applied to the charges, the ALJ concluded as a matter of law that the DOC did not meet its burden of proving any of the charges by a preponderance of the evidence. The ALJ declared:

[Anderson] did not act so as to bring disrepute/discredit upon himself, the Division or other parties. He used only that force necessary to comply with security regulations. In no sense was this excessive or unnecessary force.

The ALJ issued the following proposed order:

The decision of the Division of Correction to suspend Sgt. Anderson pending charges for removal from State service and their action to remove him from State service is REVERSED. Sgt. Anderson is to be reinstated as of the date his suspension without pay began with all rights, benefits and pay he would have been entitled to from that date to reinstatement.

### THE HEARING BEFORE THE DESIGNEE OF THE SECRETARY OF PERSONNEL

A hearing on the proposed decision of the ALJ was triggered by exceptions filed by The Maryland Penitentiary with the SOP. The Penitentiary claimed four errors of law and three errors of fact. It requested that the SOP:

A. Reject the Proposed Decision as issued;

B. Substitute [the SOP's] own Findings of Fact and Conclusions of Law;

C. Sustain the Charges and each of them. . . .

It suggested a choice of sanctions:

D. Remove the employee From state service . . .; or

E. Demote the employee to CO–II; or

F. Substitute a lengthy suspension.

The designee of the SOP (SOPD) conducted the hearing. An employee of the Department of Public Safety and Correctional Services represented the Maryland Penitentiary, and the Director of Field Services for the Maryland Correctional Unit represented Anderson. The SOPD "reviewed the entire record [including] the taped proceeding of the administrative hearing before the [ALJ]." Upon review of the record and hearing the oral arguments, the SOP "adopt[ed] in part and reject[ed] in part the [ALJ's] proposed findings of fact and conclusions of law." The SOPD made these findings of fact:

1. On January 15, 1991, Sergeant William Anderson was the shift Officer In Charge (OIC) on the South Wing of the Maryland Penitentiary.

2. During the course of his morning security round, Sergeant Anderson saw an inmate being handcuffed outside of his cell which was a violation of Post Order 12 and a breach of security.

3. Upon reaching the cell, Sergeant Anderson noticed that Officer Dorsey was attempting to handcuff the inmate in the front by placing one cuff on his wrist and the other on a crutch.

4. Sergeant Anderson ordered that the inmate's wrists be cuffed together in front of him.

5. The inmate told Sergeant Anderson that he was a short timer and would take care of him when he "got uptown."

6. The inmate argued with Sergeant Anderson. Mr. Anderson ordered the inmate to return to his cell.

7. The inmate backed partially into his cell, facing outward and Officer Dorsey moved into the doorway of the cell to remove the inmate's handcuffs.

8. Officer Dorsey was between Sergeant Anderson and the inmate and she was facing the inmate.

9. The inmate's verbal barrage against Sergeant Anderson continued and, with cuffed hands, he swung his crutch.

10. Sergeant Anderson order Officer Dorsey to step out of the cell and he entered the cell and asked the inmate to surrender the crutch. The inmate refused to let go of the crutch.

11. Sergeant Anderson and the inmate grappled for the crutch and with each other.

12. Sergeant Anderson grabbed the face of the inmate and shoved the inmate into the wall of the cell several times. Sergeant Anderson got the inmate positioned in a headlock. The two fell onto the bed and then rolled onto the floor.

13. Sergeant Anderson laid on top of the inmate pinning his arms; the inmate intertwined his legs with Sergeant Anderson's and both were unable to break the hold of the other.

14. When the scuffle began, Officer Dorsey took the keys from Officer Brandon, and went to call in a "Signal 13" indicating an officer was in confrontation with an inmate.

15. Officer Brandon remained on the scene but did not assist Sergeant Anderson in subduing the inmate.

16. A response team reported to the cell pursuant to the Signal 13 call.

17. Lt. Wouldridge entered the cell and observed Sergeant Anderson and the inmate in the position described in Finding #13 above.

18. Sergeant Anderson stood up after a response team member freed his legs.

19. Lt. Wouldridge escorted the inmate to the in-house medical facility for treatment of his injuries. The inmate was treated for abrasions and skin lacerations on his face and back.

20. The inmate was handcuffed in front throughout the entire incident.

21. The inmate had a history of verbal and physical assaultive behavior.

22. On January 16, 1991, Sergeant Anderson reported to work with a swollen arm, abrasions, bruises and lacerations, which caused him to seek medical treatment.... He did not report back to work until January 18, 1991.

23. All required incident and use of force reports were filed by the participants and observers who were on site at the time of the incident.

24. Sergeant Anderson was rated overall satisfactory in his efficiency reports for 1989 and 1990 and superior in the 1988 report.

25. On January 16, 1991, Sergeant Anderson was suspended pending charges for removal for his involvement in the January 15 incident.

The SOPD complained that the ALJ "apparently gave weight to only the testimony of Sergeant Anderson and Officers Dorsey and Brandon." She observed: "It appears that he completed ignored, without explanation, the testimony of other witnesses. Even in relating the testimony of Sergeant Anderson, the [ALJ] ignored pertinent facts established in the record." She said, early on in her opinion:

In light of relevant facts discovered in the record, I reasonably conclude that Mr. Anderson did use excessive force in dealing with the inmate....

She opined, "Consequently, the charges against him should be sustained and his termination upheld."

The SOPD noted that Anderson, Dorsey and Brandon testified at the hearing before the ALJ and each submitted two reports of the incident. "All three of the officers

reported that Mr. Anderson and the inmate became involved in a physical altercation." The SOPD observed:

> According to Mr. Anderson's direct testimony, Officer Dorsey was standing in the doorway of the cell attempting to remove the inmate's handcuffs. Out of concern for Officer Dorsey's safety, Mr. Anderson stepped between Dorsey and the inmate to remove the cuffs himself. He asked the inmate to surrender a crutch he was using and then reached for it. According to Mr. Anderson, the inmate snatched the crutch and swung it at him so he (Anderson) "grabbed the inmate in the face area and slammed him against the wall of the cell several times." Mr. Anderson explained that he then got the inmate in a headlock. The inmate hit him in the body and Mr. Anderson reported that he hit the inmate in the side with his fist. The two fell against the bed and onto the floor, at which time the response team arrived to control the disturbance.

The SOPD acknowledged that Anderson, Dorsey and Brandon "maintained that Mr. Anderson confronted the inmate in order to protect himself and Officer Dorsey from personal injury." But the SOPD believed that

> [i]t was clear from Mr. Anderson's testimony that he considered the crutch a weapon and he believed that the inmate should not be allowed to retain it in his cell. However, the uncontroverted testimony that the inmate needed the crutch to navigate and that his hands were cuffed in front of him throughout the entire incident cannot be ignored. Also several of the witnesses confirmed management's contention that Mr. Anderson could have retreated from the cell and locked the inmate inside, instead of taking such an aggressive stance of trying to single-handedly wrest the crutch from the inmate.

"Consequently," the SOPD concluded, "there were other non-forceful solutions available to Mr. Anderson."

> [Anderson's] own testimony concerning his involvement in the physical altercation ... leads one to reasonably

conclude that he used more force than necessary to resolve the situation.

The SOPD found that the Maryland Penitentiary had met its burden of proving by a preponderance of the evidence that "Anderson used excessive force in dealing with the inmate...." She concluded further that "such behavior violates COMAR .47B, D & L; DCR 50–2.IV.A.4 & 19a; DCR 50–6, DCR 50–54, DCR 110–23, and the cited Post Order." But she agreed with the ALJ that the "charges of violating COMAR .47L & DCR 50–2.IV.A.25 were not substantiated," even though she had just stated that COMAR .47L had been violated. "Consequently," she said, "I dismiss the proposal rendered by the Administrative Law Judge that Mr. Anderson be returned to duty. I believe that the employee's termination, *as mandated by DCR 50–54.IV*, should be sustained." (Emphasis added). The SOPD ordered that

William Anderson be removed from his Correctional Officer III position at the Maryland Penitentiary, effective January 16, 1991 (the date of his suspension).

Anderson, aggrieved by this final order, sought judicial review by the Circuit Court for Baltimore City pursuant to SG § 10–215.

## THE REVIEW BY THE CIRCUIT COURT
## FOR BALTIMORE CITY

On the judicial review by the Circuit Court for Baltimore City, the decision of the agency was affirmed by the judge after hearing from the parties. The judge found that "there was substantial evidence upon which the Secretary could make the findings which she did...." He said:

I think there is substantial evidence to indicate both that excessive or unnecessary force was used against the inmate, as well as substantial evidence to support a finding that the force used had the potential for the results of serious bodily harm, death, or serious breach of security of the institution, its staff, inmates, or the general public.

The judge observed, "The injuries per se to the inmate, Mr. Wooden, may have been superficial but the evidence is sufficient to allow the Secretary to find that the force applied was excessive and not necessary." The judge opined that the arguments advanced by Anderson were not "in any way frivolous." He said:

Reasoning minds can differ, as they have already as witness the positions of the Administrative Law Judge and the Secretary, and where reasoning minds can differ I cannot change the result below. And I do not find that it's an arbitrary or capricious decision.

### THE STANDARD FOR JUDICIAL REVIEW

The authority of a circuit court on judicial review of a final order under the APA is spelled out in SG § 10–215(g). The subsection provides:

In a proceeding under this section, the court may:

(1) remand the case for further proceedings;

(2) affirm the decision of the agency; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision of the agency:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the agency;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary or capricious.

*See* Maryland Rules, ch. 1100, subtitle B, Rules B1–B13, implementing SG § 10–215.

We have reviewed a goodly number of our cases addressing the matter of judicial review. They range from the first one governed by the Administrative Procedure Act after its enactment in 1957, *Bernstein v. Real Estate Comm*, 221 Md. 221, 156 A.2d 657 (1959), appeal dismissed, 363 U.S.

419, 80 S.Ct. 1257, 4 L.Ed.2d 1515 (1960), to the most recent, *Dashiell v. Department of Health*, 327 Md. 130, 607 A.2d 1249 (1992). The opinions discuss the import of what is now § 10-215(g), explicate it and apply it. All of them sing the same tune; the melody of each is identical. Even though the lyrics may vary at times, their substance is always in harmony. *See*, in addition to *Bernstein* 221 Md. at 224–225 and 230, 156 A.2d 657 and *Dashiell* 327 Md. at 137–138, 607 A.2d 1249, *State Board v. Ruth*, 223 Md. 428, 436–437, 165 A.2d 145 (1960); *Kaufman v. Taxicab Bureau*, 236 Md. 476, 484, 204 A.2d 521 (1964), *cert. denied*, 382 U.S. 849, 86 S.Ct. 95, 15 L.Ed.2d 88 (1965); *Nuger v. Insurance Comm'r*, 238 Md. 55, 61, 207 A.2d 619 (1965); *Melfa v. Commissioner*, 240 Md. 744, 746, 215 A.2d 755; *cert. denied*, 384 U.S. 1001, 86 S.Ct. 1922, 16 L.Ed.2d 1014 (1966); *Eger v. Stone*, 253 Md. 533, 542, 253 A.2d 372 (1969); *Grosman v. Real Estate Comm'n*, 267 Md. 259, 268, 297 A.2d 257 (1972); *Zeitschel v. Board of Education*, 274 Md. 69, 79, 332 A.2d 906 (1975); *Dep't of Nat. Res. v. Linchester*, 274 Md. 211, 224–226, 334 A.2d 514 (1975); *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 511–513, 390 A.2d 1119 (1978); *Holy Cross Hosp. v. Health Services*, 283 Md. 677, 683, 393 A.2d 181 (1978); *Annapolis v. Annap. Waterfront Co.*, 284 Md. 383, 394–396, 396 A.2d 1080 (1979); *Courtney v. Board of Trustees*, 285 Md. 356, 361–363, 402 A.2d 885 (1979); *Md. State Dep't of Personnel v. Sealing*, 298 Md. 524, 535–536, 471 A.2d 693 (1984); *United Steelworkers v. Beth. Steel*, 298 Md. 665, 679, 472 A.2d 62 (1984); *Balto. Lutheran High Sch. v. Emp. Sec. Adm.*, 302 Md. 649, 660–661, 490 A.2d 701 (1985); *Board of Educ., Mont. Co. v. Paynter*, 303 Md. 22, 35–36, 491 A.2d 1186 (1985); *State Election Bd. v. Billhimer*, 314 Md. 46, 58–59, 548 A.2d 819 (1988), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989); *Board of County Comm'rs v. Holbrook*, 314 Md. 210, 218, 550 A.2d 664 (1988); *Caucus v. Maryland Securities*, 320 Md. 313, 323–324, 577 A.2d 783 (1990). There are a host of other of our cases cited in the above cases in support of the principles they expressed.

■ No matter how the test for reviewing factual findings of administrative agencies is phrased, the reviewing court's

> appraisal or evaluation must be of the agency's factfinding results and not an independent original estimate of or decision on the evidence.

Hammond, C.J., speaking for a majority of the Court in *Insurance Comm'n v. Nat'l Bureau*, 248 Md. 292, 309, 236 A.2d 282 (1967). The Chief Judge recognized that

> [t]he required process is difficult to precisely articulate but it is plain that it requires restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions under any of the tests, all of which are similar. There are differences but they are slight and under any of the standards the judicial review essentially should be limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. This need not and must not be either judicial fact-finding or a substitution of judicial judgment for agency judgment.

*Id.* at 309–310, 236 A.2d 282. "[T]he common denominator of the scope of judicial review with respect to all administrative agencies," we said in *Balto. Lutheran High Sch.*, 302 Md. at 661, 490 A.2d 701, is "[t]he substantiality of the evidence."

> That is to say, a reviewing court, be it a circuit court or an appellate court, shall apply the substantial evidence test to the final decisions of an administrative agency, but it must not itself make independent findings of fact or substitute its judgment for that of the agency.

*Id.* at 662, 490 A.2d 701. *Bulluck*, 283 Md. 505, 390 A.2d 1119, (Eldridge, J.) drew upon our cases as well as *Universal Camera Corp. v. National Labor Rel. Bd.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951) and *Consolidated Edison Co. v. National Labor Rel. Bd.*, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938) and referred to treatises and law journals in explaining the meaning of "substantial evidence." The Court said:

"Substantial evidence" as the test for reviewing factual findings of administrative agencies, has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion...." The scope of review "is limited 'to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached.'"

*Id.* 283 Md. at 512, 390 A.2d 1119 (citations omitted). It pointed out:

In applying the substantial evidence test, we have emphasized that a "court should [not] substitute its judgment for the *expertise* of those persons who constitute the administrative agency from which the appeal is taken."

*Id.* at 513, 390 A.2d 1119 (citations omitted) (emphasis in original). The Court explained, "We must also review the agency's decision in the light most favorable to the agency, since 'decisions of administrative agencies are prima facie correct,' ... and 'carry with them the presumption of validity.'" *Id.* (citations omitted). "Furthermore," Judge Eldridge continued,

not only is it the province of the agency to resolve conflicting evidence, but where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inferences.

*Id.* (citations omitted).[2]

 One of the main objectives of the Legislature in establishing the OAH was to provide an impartial hearing officer in contested cases. A hearing officer employed by

---

2. We observed in *United Steelworkers v. Beth. Steel,* 298 Md. 665, 679, 472 A.2d 62 (1984):

Judicial review of administrative action differs from appellate review of a trial court judgment. In the latter context the appellate court will search the record for evidence to support the judgment and will sustain the judgment for a reason plainly appearing on the record whether or not the reason was expressly relied upon by the trial court. However, in judicial review of agency action the court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency.

and under the control of the agency where the contested case or other disputed action arises, often results in the appearance of an inherent unfairness or bias against the aggrieved. *See* the Final Report of the "Governor's Task Force on Administrative Hearing Officers." (1988). It is apparent that the Legislature, in enacting the OAH statute did not depart from the principles which have been recognized in our opinions that govern judicial review of an agency's final decision. The OAH act on its face and the APA as amended to accommodate the provisions of the OAH act did not address the test for judicial review. The standard for judicial review remained the same as we had consistently declared it to be.

The creation of an ALJ as a impartial hearing officer in administrative proceedings introduced another factor to be considered in our standard for judicial review. To determine what impact the findings of fact, conclusions and proposed order of an ALJ have on an agency's final order provoked us to look again to *Universal Camera*, 340 U.S. 474, 71 S.Ct. 456. The essential issue raised in *Universal Camera* was "the effect of the Administrative Procedure Act and the ... Taft–Hartley Act ... on the duty of Courts of Appeals when called upon to review orders of the National Labor Relations Board." 340 U.S. at 476, 71 S.Ct. at 458. After carefully tracing the history of the reviewing power, *id.* at 477–486, 71 S.Ct. at 459–63, the Court held that

> the standard of proof specifically required of the Labor Board by the Taft–Hartley Act is the same as that to be exacted by courts reviewing every administrative action subject to the Administrative Procedure Act.

*Id.* at 487, 71 S.Ct. at 463. Charles H. Koch, Jr. observed in his *Administrative Law and Practice* (1985), Vol. 1, § 6.73 at 520 (hereinafter "Koch"), that *Universal Camera* "outlined the significance of the presiding officer's findings for the agency and ultimately for the court." Our Administrative Procedure Act parallels the federal Administrative Procedure Act sufficiently so that the guidelines of *Universal Camera* relate to proceedings under our Act.

The meat of *Universal Camera* on the standard of judicial review is contained in Part III of the opinion. The basic concept of the test firmly established by our opinions is left intact. *Universal Camera* is not contrarient to our test but explicates it. First we note that *Universal Camera* made perfectly clear that the responsibility for the final decision placed on the agency "is wholly inconsistent with the notion that the [agency] has power to reverse an examiner's findings only when they are 'clearly erroneous.'" 340 U.S. at 492, 71 S.Ct. at 467. This assertion was confirmed in *Federal Commun. Com'n v. Allentown Broad. Corp.*, 349 U.S. 358, 364, 75 S.Ct. 855, 859, 99 L.Ed. 1147 (1955).

 Given that there is no error of law within the contemplation of § 10–215(g)(3)(i)(ii)(iii) and (iv), the test firmly established by our opinions follows the dictate of § 10–215(g)(3)(v), that the decision of the agency shall be reversed or modified "if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision of the agency"

is unsupported by competent, material, and substantial evidence in light of the entire record as submitted....

Ordinarily, if the decision is so unsupported, it may also be "arbitrary and capricious" under § 10–215(g)(3)(vi). *See Dashiell*, 327 Md. at 137–138, 607 A.2d 1249. *Universal Camera* fleshed out what constitutes the "entire record." The Supreme Court observed:

Surely an examiner's report is as much a part of the record as the complaint or the testimony.

*Id.* 340 U.S. at 493, 71 S.Ct. at 467. The determination of the substantiality of the record includes the examiner's report. *Id.* But, the Court cautioned:

We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve.

340 U.S. at 496, 71 S.Ct. at 469. The Court made clear that the " 'substantial evidence' standard is not modified in any

way when the [agency] and its examiner disagree." *Id.*
The Court explained:

> We intend only to recognize that evidence supporting a
> conclusion may be less substantial when an impartial,
> experienced examiner who has observed the witnesses
> and lived with the case has drawn conclusions different
> from the [agency's] than when he has reached the same
> conclusion. The findings of the examiner are to be con-
> sidered along with the consistency and inherent probabili-
> ty of testimony.

*Id.* The Court emphasized:

> The significance of his report, of course, depends largely
> on the importance of credibility in the particular case. To
> give it this significance does not seem to us materially
> more difficult than to heed the other factors which in sum
> determine whether evidence is "substantial."

*Id.* at 496–497, 71 S.Ct. at 469. On the matter of assessing
the credibility of the witnesses the Court indicated that the
agency should give appropriate deference to the opportuni-
ty of the examiner to observe the demeanor of the witness-
es.

> All aspects of the witnesses demeanor—including the
> expression of his countenance, how he sits or stands,
> whether he is inordinately nervous, his coloration during
> critical examination, the modulation or pace of his speech
> and other non-verbal communication—may convince the
> observing [hearing officer] that the witness is testifying
> truthfully or falsely.

*Penasquitos Village, Inc. v. N.L.R.B.,* 565 F.2d 1074, 1078–
1079 (9th Cir.1977). "Nothing in the statutes," *Universal
Camera* pointed out,

> suggests that the [agency] should not be influenced by
> the examiner's opportunity to observe the witnesses he
> hears and sees and the [agency] does not.

340 U.S. at 495, 71 S.Ct. at 468. "Nothing suggests," the
Court continued, "that reviewing courts should not give to
the examiner's report such probative force as it intrinsically

commands." *Id.* "The [agency's] findings are entitled to respect...." *Id.* at 490, 71 S.Ct. at 466.

> [B]ut they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the [agency's] decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.

*Id.* In other words, the decision of the agency must be vacated when "the standard appears to have been misapprehended or grossly misapplied." *Id.* at 491, 71 S.Ct. at 466.

Koch stated on the question of credibility:

> The presiding officer's findings as to credibility have almost conclusive force and the importance of credibility evidence to the final decision will affect the weight given the presiding officer's findings.

*Koch, § 6.73* at 522 (footnote omitted). He quoted *General Dynamics v. OSHRC,* 599 F.2d 453, 463 (1st Cir.1979) for the general principle regarding the administrative review body's authority over credibility findings of the hearing officer:

> "the credibility findings of the person who sees and hears the witnesses—be he ALJ, juror or judge—is entitled to considerable deference. While the degree of deference due the ALJ's final decision is related to the importance of credibility in a particular case, the ALJ's decision to give or deny credit to a particular witness' testimony should not be reversed absent an adequate explanation of the grounds for the reviewing body's source of disagreement with the ALJ."

*Koch, § 6.73* at 522 (footnote omitted). "In sum," Koch concluded, "the review authority has the power to reject credibility assessments only if it gives strong reasons for doing so." *Id.* (footnote omitted).

We have surveyed a fair sampling of cases in other jurisdictions which address the matter of judicial review of the final decision of an administrative agency. *See Appen-*

*dix* hereto. They all look to *Universal Camera* and are in line with our test as explicated by that opinion. The cases recognize that "[w]hile the standard set forth in *Universal Camera* is imprecise, 'it provides as much clarity as the area affords.'" *N.L.R.B. v. Interboro Contractors, Inc.,* 388 F.2d 495, 499 (2d Cir.1967), quoting *Bon–R Reproductions, Inc. v. NLRB,* 309 F.2d 898 (2d Cir.1962). *Universal Camera* itself recognized that a precise standard for review "cannot be imprisoned within any form of words...." 340 U.S. at 489, 71 S.Ct. at 465. It noted, "There are no talismanic words that can avoid the process of judgment. The difficulty is that we cannot escape, in relation to this problem, the use of undefined defining terms." *Id.* "But," the Court observed, "a standard leaving an unavoidable margin for individual judgment does not leave the judicial judgment at large even though the phrasing of the standard does not wholly fence it in." *Id.* Kenneth Culp Davis, in his *Administrative Law Treatise* (1980), Vol. 3, § 17.16 at 330, observed that the principles of *Universal Camera* "are reasonably clear, but a good many problems arise in applying them...." He selected a number of cases applying the principles to show that each of the cases referred to was "unique; seldom can two or more problems about application of the principles be put together." *Id.*

## THE DECISION OF THIS COURT

As we see it, the SOPD gave no real significance to the ALJ's report. She did not adequately take into account in considering the evidence before the ALJ whatever in the record detracted from the substantiality of that evidence, as, for example the disagreement between the ALJ and the SOPD as to the disposition of Anderson. We do not agree with the appellees' assertion that "there is really no issue of credibility on the genuine issues of this case." We think that the credibility of the witnesses was of the utmost importance in the circumstances here; it played a dominant role; it was pivotal. But there is no indication that the SOPD gave any deference to the ALJ's assessment of the

credibility of the witnesses before him. And she gave no strong reasons for rejecting the ALJ's assessments of credibility. It seems that the SOPD made her own findings of fact, as suggested by the representative of the Penitentiary, and it appears that she did not take into account in making them the factual findings of the ALJ. Therefore, we believe that the Circuit Court for Baltimore City was wrong when it found that there was substantial evidence to support the order of the SOPD, because the SOPD did not appreciate the proper relationship between her and the ALJ. The SOPD must reconsider her order in the light of what we have found to be the interrelation between her function and the function of the ALJ. We vacate the judgment of the Circuit Court for Baltimore City and remand the case to it with direction to remand the case to the DOP for further proceedings in accordance with this opinion.

We note that the SOPD found that Anderson's removal was "mandated by DCR 50–54.VI." Presumably, she saw her discretion to decide on a less drastic sanction destroyed by Paragraph A of that DOC regulation. As we have noted, the regulation declares:

> Excessive or unnecessary force used against an inmate, or any other action by an employee which results in serious bodily harm, death or a serious breach of the security of the institution, its staff, inmates, or the general public, or which has the potential for such results, *shall* result in the filing of Charges for Removal from State service.

(Emphasis added). This belief was probably why she did not address the issue of mitigation raised by Anderson. In any event, she read too much into the provision.

■ DCR 50–54.VI.A does not mandate dismissal; all it does is require the filing of "Charges for Removal from State service." That much, obviously, had been accomplished and was the basis for the hearing. In fact, written charges are required to set the hearing process in motion. *See* Art. 64A, § 33(b)(2)(i); COMAR 06.01.01.48. The issue before the ALJ and the SOP was whether Anderson should,

in fact, be removed from State service in light of the charges already filed. The DCR regulation in no way binds the Department of Personnel to a preordained result in a given case; for its decision, the DOP has its own regulations to guide it.

■ The relevant DOP regulation says that a classified employee *"may* be permanently removed from his position only for cause...." COMAR 06.01.01.47 (emphasis added). The regulation then sets forth several specific transgressions that "shall be sufficient cause of removal, though removal may be for causes other than those enumerated." *Id.* COMAR 06.01.01.61, which is headed "Appeal of Charges for Removal of a Classified Employee," discusses the options open to the SOP when she resolves an employment matter such as the one at issue in this case. It says that the SOP or her designee *"may"* decide to:

(1) Restore the employee to his position without loss of pay;

(2) Suspend the employee without pay for a specified period of time;

(3) Demote the employee;

(4) Remove the employee from the position and the classified service;

(5) Require that other action be taken as indicated by the findings in the case.

COMAR 06.01.01.61H (emphasis added). The plain meaning of COMAR language applicable to the Department of Personnel is that removal is not "mandated" when an employee fails to abide by the requirements of a Division of Correction regulation. The representative of the DOP acknowledged as much at the hearing in the Circuit Court for Baltimore City. She told the court:

I do agree with [Anderson's attorney] that if the [SOP] had thought that a lesser sanction was appropriate she

didn't have to remove him because the regulation [DCR 50–54.VI.A] just says [charges] shall be filed.[3]

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED; CASE REMANDED TO THAT COURT WITH DIRECTION TO REMAND THE CASE TO THE DEPARTMENT OF PERSONNEL WITH DIRECTION TO VACATE ITS ORDER REMOVING WILLIAM HENRY ANDERSON, JR. FROM STATE SERVICE AND TO CONDUCT FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; COSTS TO BE PAID BY APPELLEES.**

APPENDIX

A sampling of cases in other jurisdictions surveyed on the issue of the standard of review in administrative proceedings.

*General Dynamics v. Occupational Safety and Health,* 599 F.2d 453, 463 (1st Cir.1979); *N.L.R.B. v. Interboro Contractors, Inc.,* 388 F.2d 495, 499 (2d Cir.1967); *Abbott Labs., Ross Labs, Division v. N.L.R.B.,* 540 F.2d 662, 667 (4th Cir.1976); *Dryden Manufacturing Company v. N.L.R.B.,* 421 F.2d 267, 269–670 (5th Cir.1970); *Ward v. N.L.R.B.,* 462 F.2d 8, 11–13 (5th Cir.1972); *Ala. Ass'n of Ins. A. & Bd. of Gov. of F.R. System,* 533 F.2d 224, 248–249 (5th Cir.1976), *vacated in part on other grounds by,* 558 F.2d 729 (5th Cir.1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978); *N.L.R.B. v. Stor–Rite Metal Products, Inc.,* 856 F.2d 957, 964 (7th Cir.1988) (citing to *Kopack v. N.L.R.B.,* 668 F.2d 946, 959–954 (7th Cir.1982), *cert. denied,* 456 U.S. 994, 102 S.Ct. 2278, 73 L.Ed.2d 1290 (1982); *Roper Corp. v. N.L.R.B.,* 712 F.2d 306, 310 (7th Cir.1983); and *Stokely–Van Camp, Inc. v. N.L.R.B.,* 722

---

**3.** An Act concerning the "Administrative Procedure Act—Contested Cases—Revision" was introduced in the 1993 session of the General Assembly as House Bill 877. It was the flowering of the Governor's Commission to Revise the Administrative Procedure Act. The Bill passed the House and the Senate without a dissenting vote, and the Governor signed it on 13 April as Acts 1993, ch. 59 to take effect 1 June 1993.

F.2d 1324, 1328 (7th Cir.1983)); *Amco Electric v. N.L.R.B.*, 358 F.2d 370, 373 (9th Cir.1966); *Penasquitos Village, Inc. v. N.L.R.B.*, 565 F.2d 1074, 1078–1079 (9th Cir.1977); *N.L.R.B. v. Warren L. Rose Castings, Inc.*, 587 F.2d 1005, 1007–1008 (9th Cir.1978); *Loomis Courier Serv., Inc. v. N.L.R.B.*, 595 F.2d 491, 495–496 (9th Cir.1979); *Butler–Johnson Corp. v. N.L.R.B.*, 608 F.2d 1303, 1305 (9th Cir. 1979); *N.L.R.B. v. Brooks Cameras, Inc.*, 691 F.2d 912, 915 (9th Cir.1982); *Pogue v. U.S. Dept. of Labor*, 940 F.2d 1287, 1290 (9th Cir.1991); *Greater Boston Television Corporation v. F.C.C.*, 444 F.2d 841, 853 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); *Local No. 441, Int. Bro. of Electrical Workers v. N.L.R.B.*, 510 F.2d 1274, 1276 (D.C.Cir.1975); *Teamsters Local U. 769 v. N.L.R.B.*, 532 F.2d 1385, 1392 (D.C.Cir.1976); *Faulkner Radio, Inc. v. F.C.C.*, 557 F.2d 866, 870 (D.C.Cir.1977); *Nichols v. Cohen*, 290 F.Supp. 207, 210 (S.D.Ill.1968); *Vinal v. Contributory Retirement Appeal Bd.*, 13 Mass.App. 85, 430 N.E.2d 440, 448–450 (1982); *Morris v. Board of Reg. in Medicine*, 405 Mass. 103, 539 N.E.2d 50, 54 *cert. denied*, 493 U.S. 977, 110 S.Ct. 503, 107 L.Ed.2d 506 (1989).