*Clarksville Residents Against Mortuary Defense Fund, Inc., et al. v. Donaldson Properties, et al.*, No. 70, September Term, 2016. Opinion by Hotten, J.

**STATUTES — GENERAL AND SPECIFIC STATUTES**
Court of Appeals held that the Howard County Board of Appeals did not err in consideration of the requirements contained in Howard County Zoning Regulations ("HCZR") §131.B and §131.N.22 because they are specific provisions governing conditional uses; whereas, HCZR §130.C, which Petitioners contend the Board should have considered, is a more general regulation that applies broadly to different zoning uses, and is therefore inapplicable. *See Lumberman's Mut. Cas. Co. v. Insurance Comm'r*, 302 Md. 248, 268, 487 A.2d 271, 281 (1985) ("[W]here one statutory provision specifically addresses a matter, and another more general statutory provision also may arguably cover the same matter, the specific statutory provision is held to be applicable and the general provision is deemed inapplicable.") (citations omitted).

**ZONING AND PLANNING — GROUNDS FOR GRANT OR DENIAL IN GENERAL**
Court of Appeals held that to satisfy the "adverse effects" test in *Schultz v. Pritts*, 291 Md. 1, 432 A.2d 1319 (1981), the Board was not required to specify what adverse effects were inherent to a funeral home before approving Donaldson's conditional use plan because the Howard County Council had already undergone an assessment of the inherent adverse effects of funeral homes and determined those inherent adverse effects are compatible with permitted uses in the RR-DEO zone.

**ZONING AND PLANNING — GROUNDS FOR GRANT OR DENIAL IN GENERAL**
Court of Appeals held that the Board did not err in concluding that it was only required to consider the enumerated considerations contained in HCZR §131.B because we give an administrative agency's interpretation and application of the statute which the agency administers considerable weight and HCZR §131.B.2.a only requires the Board to consider whether "[t]he impact of adverse effects such as noise, dust, fumes, odors, lighting, vibrations, hazards or other physical conditions w[ould] be greater at the subject site than it would generally be elsewhere in the zone or applicable other zones." HCZR §131.B.2.a; *Bd. of Quality Assurance v. Banks*, 354 Md. 59, 69, 729 A.2d 376, 381 (1999). The Court also concluded that because the "adverse effects" test espoused in *Schultz* exists within the regulatory scheme governing conditional uses, the community members were required to establish a substantial nexus between their asserted "cultural sensitivities" and the enumerated conditions contained in HCZR §131.B.2.a., which they failed to do.

**ZONING AND PLANNING — GROUNDS FOR GRANT OR DENIAL IN GENERAL**

Court of Appeals held that there was no merit to Petitioners' argument that Donaldson's proposed conditional use intended to remove fifty feet of forest from the stream buffer in violation of Maryland Department of the Environment requirements. The record contained substantial evidence that the conditional use plan contemplated a stream buffer of 100 feet and no evidence indicates that deforestation was proposed by Donaldson.

Circuit Court for Howard County
Case No. 13-C-13-095806
Argued: March 6, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 70

September Term, 2016

_____

CLARKSVILLE RESIDENTS AGAINST

MORTUARY DEFENSE FUND, INC.

et al.

v.

DONALDSON PROPERTIES et al.

_____

Barbera, C.J.,
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Opinion by Hotten, J.
Watts, J., concurs

_____

Filed: June 22, 2017

We consider whether the Howard County Board of Appeals ("the Board") erred in approving a conditional use application for a funeral home in Howard County's Rural Residential-Density Exchange Option zone ("RR-DEO").[1] In December 2009, Donaldson Properties, et al. ("Donaldson"), filed a conditional use application with the Board, seeking to build a funeral home and mortuary. The proposed site was a 3.207 parcel of land located on the western side of Maryland Route 108 and close to a stream system protected by the Maryland Department of the Environment ("MDE"). The proposed conditional use plan was initially denied by the Howard County Board of Appeals Hearing Examiner ("Hearing Examiner"), but Donaldson appealed *de novo* to the Board. The Board held public hearings spanning a total of 22 days between January, 2012 and April, 2013. After two revisions,

---

[1] Pursuant to Howard County Zoning Regulation ("HCZR") §105.0 the Rural Residential District was established

> to allow low density residential development within a rural environment. The Rural Residential District is intended for an area of the County which is already largely committed to low density residential subdivisions. Within the RR District, agriculture is permitted as well as residential development in both cluster and non-cluster forms. Cluster development is permitted in order to protect environmental and landscape resources and to preserve agricultural land.

Pursuant to HCZR §106.0, the DEO Overlay District was established

> to provide land owners in the RC and RR Districts with opportunity and incentive to preserve significant blocks of farmland in the rural area of the county. This district is also intended to encourage the clustering of residential development in areas where the development will not have an adverse impact on farm operations. To accomplish this, the DEO District allows residential density in the RC and RR Districts to be exchanged between parcels. Density exchanges in the District should result in large parcels being preserved in perpetuity, while residential development is directed toward parcels which are able to absorb the additional dwellings.

the Board approved Donaldson's conditional use application on July 13, 2013, subject to several conditions.

On August 2, 2013, community members who participated in the public hearings filed a petition for judicial review in the circuit court. Following a hearing on March 14, 2014, the circuit court issued an order on September 15, 2014, affirming the Board's decision. The community members appealed and on July 20, 2016, the Court of Special Appeals, in an unreported decision, upheld the Board's approval of Donaldson's conditional use. Thereafter, the community members filed a petition for writ of certiorari, which we subsequently granted.

For the reasons that follow, we shall affirm the judgment of the Court of Special Appeals.

## FACTS AND PROCEDURAL BACKGROUND

### I.     The Property

In December 2009, Donaldson filed a proposed conditional use plan ("Conditional Use Plan") for a funeral home and mortuary with the Board. The proposed site for the funeral home is a 3.207 acre parcel located at 12540 Clarksville Pike ("the Property") on the western side of Maryland Route 108 in the RR-DEO zoning district.[2] The Property is located in the Carroll Branch watershed with two perennial Tier II streams located along

---

[2] The RR-DEO district authorizes funeral homes as a conditional use. *See* HCZR §105.G.

the western edge of the Property.[3]  The Property is bordered by St. Louis Catholic Church directly to the north, and Christ Evangelical Lutheran Church of Columbia ("Christ Lutheran Church") to the south.  On the eastern side of Route 108, across from the Property, there is a two-story single family home setback 180 feet from Route 108.  To the west of the Property, there is a 42.44-acre non-buildable preservation parcel owned by Howard County.  Several housing developments are in the vicinity of the Property, including the Preserve of Clarksville development to the west of the non-buildable parcel, the Clarks

---

[3] The Maryland Department of the Environment defines a Tier II stream as those streams "[w]here water quality is better than the minimum requirements specified by the water quality standards[]" and requires that the water quality in those streams be maintained. *See* COMAR 26.08.02.04-1A.  Mark Burchick ("Mr. Burchick"), an environmental consultant who testified before the Board on behalf of Donaldson, explained that

> The Maryland Department of the Environment has a Division called the Science of Service Center, and they've gone out and done various exhaustive studies related to what they call the index of biological integrity. And they look at two parameters – fish and aquatic insects. They call those benthics (?), and when you walk a reach of stream, and you go into the pools and up under undercuts where the fish live and you electroshock it, and you grab the fish, if you get just one species, a rosy side dace, that's not necessarily a great biological indicator of a really good stream. But if you find six or seven species and you get a good number of those each, that kind of suggests that that stream has a much higher water quality. Then they do the same thing for aquatic insects. If you get just a bunch of worms, that's not going to be too good, but if you start getting the aquatic insects with two and three tails and a diversity of them, that denotes relative health based on the diversity that you're getting. So in a Tier II stream, they get these IBI scores, Indicators of Biological Integrity, that are really high. And one of those streams happens to be Carrolls Branch, which is the named tributary for which this watershed, where the Donaldson Funeral Home is, goes through.

3

Glen housing developments to the north of St. Louis Church, and the Clarksville Overlook housing development to the south of Christ Lutheran Church.

Donaldson proposes to construct an approximately 17,049 square foot funeral home and mortuary on the Property. The funeral home would be approximately 135 feet in length, from east to west, 70 feet wide, from north to south, and approximately 32.5 feet tall. The funeral home would be situated in the southeastern section of the Property, approximately 125 feet from Route 108 and 30 feet from the southern lot line. The funeral home is designed to be compatible in scale and character with the residential development in the vicinity.[4] Viewings would be held on the Property between 2 p.m. and 4 p.m. and between 7 p.m. and 9 p.m., Sunday through Friday, and funeral services between 10 a.m. and 1 p.m., Monday through Saturday. Outside of those times, fewer people would be on the Property for general office and business purposes.

## II. Procedural Background

Pursuant to Howard County Code ("HCC") §16.302(a),[5] between April 26 and October 25, 2010, the Hearing Examiner considered the Conditional Use Plan. On March

---

[4] John Gary, a registered architect, testified before the Board that the funeral home is designed to appear as a one-story building from Route 108, and its scale should be taken in context of the two large, existing churches that are to the north and south of the Property. Mr. Gary also noted that the funeral home will contain a carport; a fireplace off the main lobby for a sitting area; residential-type windows, small fenestrations; limited points of entrance; hip roofs instead of flat roofs, with composition shingles; masonry consisting of inset brick with stone; and a stone water table.

[5] HCC §16.302(a) states "[e]xcept as provided in subsections (b) and (c), wherever in this Code or the zoning regulations a matter is authorized to be heard and decided by the Board of Appeals, the matter will first be heard and decided by a Hearing Examiner."

4

17, 2010, the Howard County Department of Planning and Zoning ("DPZ") issued their Technical Staff Report ("TSR"), recommending that the Conditional Use Plan be approved, subject to certain conditions.[6] On November 29, 2010, the Hearing Examiner denied the Conditional Use Plan, prompting Donaldson to appeal to the Board for a *de novo* review.

Between January 10, 2012 and April 30, 2013, the Board held hearings on the Conditional Use Plan.[7] Clarksville Residents Against the Mortuary, Inc., et al. ("Petitioners") participated in the proceedings as members in opposition to the Conditional

---

[6] The TSR recommended,

1. The Conditional Use shall be conducted in conformance with and shall apply only to the Funeral Home as described in the petition and as depicted on the Conditional Use plan submitted on February 2, 2010, and as may be revised by the Hearing Examiner, and not to any other activities, uses, or structures on the Property.

2. The Petitioner shall comply with all agency comments.

3. Should the Hearing Authority approve the reduced setbacks, it is recommended that the site be specifically designed to allow for a required six foot minimum privacy fence or masonry wall and a Type E landscape buffer on the north side and that a minimum of a Type D landscape buffer be required on the south side as noted above.

4. It is recommended that the proposed walkway on the south side of the Site be eliminated.

5. It is recommended that the Petitioner specify the total hours and days of operation for the facility, including evening activities beyond visiting hours and the hours of use of the chapel.

[7] The Board held hearings on January 10, February 28, March 1, March 8, May 3, May 29, May 31, June 14, August 2, August 14, August 23, October 9, October 25, November 1, November 27, and November 29, 2012; January 22, January 24, January 31, March 5, March 14, April 4, and April 30, 2013.

5

Use Plan. During the proceedings, Donaldson submitted two revised proposed conditional use plans, the first on January 10, 2012, and the second on August 23, 2012 (hereinafter "Revised Plan"). The DPZ subsequently issued two addendums to its TSR, the first on February 1, 2012, and the second on August 23, 2012. The DPZ concluded in both addendums that Donaldson's proposed conditional use met the General Standards and Specific Criteria for a funeral home and mortuary conditional use, and recommended the plan be approved.

On July 3, 2013, the Board issued a Decision and Order finding that the Revised Plan met all of the legal criteria for the conditional use. The Board granted Donaldson's conditional use, subject to several conditions.[8] In support of its decision, the Board, in relevant part, rendered the following findings of fact:

---

[8] The Board placed the following conditions on the Revised Plan's approval:

(1) The conditional use shall apply only to the proposed funeral home and mortuary as described in the petition and as depicted on the Amended Conditional Use Plan dated August 15, 2012 and not to any other activities, uses or structures on the Property.
(2) [Donaldson] shall utilize a double-walled holding tank for embalming fluid wastewater with double walled pipes and leak sensors for the system.
(3) [Donaldson] shall construct (a) a deceleration lane at least 250 feet long for vehicles entering the Property from southbound Maryland Route 108; (b) an acceleration lane for vehicles exiting the Property in the southbound direction; and (c) an appropriate left turn bypass lane for northbound Maryland Route 108 in the vicinity of the proposed access point for the Property.
(4) The Property shall not be used as a crematorium without subsequent conditional use approval.
(5) [Donaldson] shall comply with all applicable Federal, State, and County laws and regulations.

6

[Robert] Vogel[9] also stated that the [Revised] Plan is consistent with the General Plan given that legislation had recently been proposed to remove the funeral home conditional use from the RR-DEO zone, but DPZ and [the Board] recommended against its enactment. According to Mr. Vogel, this action by County planning agencies affirmed that funeral homes are important in the RR-DEO zone.

\* \* \*

Testifying regarding potential adverse impacts, Mr. Vogel provided a lighting plan that would generate no light trespass beyond the parking lot. Mr. Vogel testified that the adverse effects of noise, dust, fumes, odors, lighting, vibrations, hazards or other physical conditions would not be greater at the Property than they would generally be elsewhere in the RR-DEO zone or applicable other zones.

\* \* \*

Shun Lu testified that she is a resident of Clarksville, Maryland, and that she is opposed to the petition. Ms. Lu testified that persons of Asian descent have a cultural sensitivity to funeral homes and that she believed it to be bad luck to live close to a funeral home.

\* \* \*

[Dr. Peter] Li [ ] testified that funeral homes are not compatible with nearby residences from a feng shui[10] perspective.

\* \* \*

Marianne Lee testified that she is a resident of Clarksville, Maryland, and that she is opposed to the petition. Ms. Lee testified that persons of Asian descent have a cultural sensitivity to funeral homes.

---

[9] Robert Vogel is a civil engineer who was hired by Donaldson to create the site plan for the proposed funeral home that accompanied Donaldson's Conditional Use Plan.

[10] The Merriam Webster Dictionary defines "feng shui" as

a Chinese geomantic practice in which a structure or site is chosen or configured so as to harmonize with the spiritual forces that inhabit it …. [A] Chinese system for positioning a building and the objects within a building in a way that is thought to agree with spiritual forces and to bring health and happiness.

MERRIAM WEBSTER DICTIONARY ONLINE, https://perma.cc/F5T8-Y8G7 (last accessed: May 30, 2017). The Oxford English Dictionary defines "feng shui" as "(in Chines thought) a system of laws considered to govern spatial arrangement and orientation in relation to the flow of energy (chi), and whose [favorable] or [unfavorable] effects are taken into account when siting and designing buildings." OXFORD ENGLISH DICTIONARY ONLINE, https://perma.cc/G3CE-DKB9 (last accessed: May 30, 2017).

7

\* \* \*

Anthony Redman, a professional land planner, testified that he believed the Property to be too small for the proposed use. Mr. Redman stated that he believed that MDE could require a 150 feet buffer from the stream tributary running along the west side of the Property instead of the 100 foot buffer shown on the Plan. Mr. Redman testified that the stream is a Tier II stream.

\* \* \*

Tiru Liang testified that she is a resident of Clarksville, Maryland, and that she is opposed to the petition …. Ms. Ming [sic] stated that she was also concerned with the potential environmental impacts of the Funeral Home.

Richard Klein, a professional environmental consultant, testified that he believed the Property might not be able to satisfy environmental site design standards.

\* \* \*

On rebuttal … Mr. Vogel stated that he visited the Property and that no wetlands or wetlands buffers existed on the Property. Regarding potential impacts to the Tier II stream, Mr. Vogel testified that the purpose of the 100 foot buffer was to protect the stream. So long as [Donaldson] complied with the imposed buffer, according to Mr. Vogel, the stream would not be adversely impacted …. Finally, Mr. Vogel testified that persons of Asian descent moved into new homes located in close proximity to two existing funeral homes on Old Columbia Pike in Ellicott City.

\* \* \*

On rebuttal, Mark Burchick, an environmental consultant, testified that the stream buffer would be 100 feet from the unnamed tributary located at the northwest corner of the Property. [Mr.] Burchick stated that even if a temporary encroachment into the buffer was necessary during the site development process, MDE would be unlikely to impose a greater buffer from the stream tributary. Mr. Burchick testified that the 100 foot stream buffer shown on the Plan would be sufficient to prevent deleterious impacts to the stream.

\* \* \*

On rebuttal, Jennifer Yocum, a feng shui consultant, testified that [Donaldson] incorporated into the Plan several features Ms. Yocum proposed in order to improve the feng shui of the Funeral Home. Ms. Yocum testified that she did not believe the Funeral Home would adversely impact nearby residents from a feng shui perspective.

\* \* \*

8

The Board based its conclusions of law exclusively on the General Standards for Conditional Use Approval contained in Howard County Zoning Regulation ("HCZR")[11] §131.B and the Specific Criteria for Funeral Homes and Mortuaries contained in HCZR §131.N.22. In relevant part, the Board concluded that:

[Donaldson's Revised] Plan is in harmony with the land uses and policies indicated in Howard County's General Plan, PlanHoward2030, for the RR-DEO zoning district. Funeral homes and mortuaries that satisfy the conditional use requirements of the [HCZR] are presumed to promote the general welfare of the community and the RR-DEO zoning district. Evidence was produced before the Board indicating that legislation had been proposed to remove the funeral home and mortuary conditional use from the RR-DEO zoning district. [The Board] and DPZ, however, recommended against such removal, and the legislation was not enacted. These actions by agencies charged with planning responsibilities for the County confirm that funeral homes and mortuaries are important in the County's RR-DEO zoning district and are consistent with the policy goals of the General Plan.

\* \* \*

2. Adverse Effect: Section 131.B.2 of the [HCZR] provides, in pertinent part, the Board shall have the power to permit a conditional use provided that the proposed location will not have adverse effects on vicinal properties above and beyond those ordinarily associated with such uses. In evaluating the Plan under this standard, the Board shall consider the following four adverse effect criteria: (a) physical conditions; (b) structures, walls, fences, and landscaping; (c) parking areas, loading areas, driveways, and refuse areas; and (d) safe access.

When assessing a proposed conditional use under these criteria, the Board must begin with the realization that virtually every human activity has the potential for adverse impact. Zoning recognizes this fact and, when concerned with conditional uses, accepts some level of such impact in light of the beneficial purposes the zoning body has determined to be inherent in the use. Thus, the question before the Board is not whether the proposed use would have adverse effects in an RR-DEO zoning district. The proper question is whether those inherent adverse effects are greater at the proposed Property than they would be generally elsewhere within the RR-DEO zoning

---

[11] All citations to the HCZR in this opinion are based on the HCZR as it existed in 2012, when the Board considered the Revised Plan. On October 6, 2013, the Howard County Council adopted the current version of the HCZR.

9

district. *Schultz v. Pritts*, 291 Md. 1, 432 A.2d 1319 (1981); *Mossburg v. Montgomery County*, 107 Md. App. 1, 666 A.2d 1253 (1995).

\*     \*     \*

Much of the testimony presented by the [Petitioners] amounted only to unsupported opinions and conclusions. Unsupported conclusions or fears of witnesses to the effect that a proposed use of property will or will not result in harm amount to nothing more than vague and general expressions of opinion that are lacking in probative value. *Anderson v. Sawyer*, 23 Md. App. 612, 329 A.2d 716 (1974).

\*     \*     \*

[T]he [Revised] Plan complies with all legally imposed stream buffer requirements. [Petitioners] presented no credible testimony that the stream buffer would be increased, or that adverse impacts would occur to the stream irrespective of the Petitioner's adherence to the legally imposed buffer. [Donaldson's] witnesses, on the other hand, testified that the proposed use as shown on the Plan would not result in adverse impacts on the stream.

The Board further concludes that the cultural sensitivities testified to by various [Petitioners] is not a "physical condition" to be considered pursuant to [HCZR] Section 131.B.2.a. Even if it were a relevant consideration, the Board considered the totality of the evidence presented in this case and is not persuaded that the proposed use will create an adverse cultural impact on vicinal properties or that such impact will be above and beyond those ordinarily associated with funeral home and mortuary uses in the RR-DEO zoning district.

\*     \*     \*

On August 2, 2013, Petitioners filed a Petition for Judicial Review in the Circuit Court for Howard County. On March 14, 2014, the circuit court held a hearing, and on September 15, 2014, issued an order affirming the Board's decision.

On October 15, 2014, Petitioners filed a timely appeal to the Court of Special Appeals. In an unreported opinion, the Court of Special Appeals affirmed the judgment of the circuit court. *See Clarksville Residents Against Mortuary Defense Fund, Inc., et al. v. Donaldson Properties, et al.*, No. 1762, Sept. Term 2014 (filed July 20, 2016).

Additional facts shall be provided, *infra*, to the extent they prove relevant in addressing the issues presented.

10

**STANDARD OF REVIEW**

When reviewing the final decision of an administrative agency, "we look 'through the circuit court's and intermediate appellate court's decisions, although applying the same standards of review, and evaluate[ ] the decision of the agency.'" *People's Counsel for Balt. County v. Loyola Coll. of Md.*, 406 Md. 54, 66, 956 A.2d 166, 173 (2008) (quoting *People's Counsel for Balt. County v. Surina*, 400 Md. 662, 681, 929 A.2d 899, 910 (2007)). Judicial review of an administrative agency decision is "limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised on an erroneous conclusion of law." *Bd. of Physician Quality Assur. v. Banks*, 354 Md. 59, 67-68, 729 A.2d 376, 380 (1999) (quoting *United Parcel v. People's Counsel*, 336 Md. 569, 577, 650 A.2d 226, 230 (1994)). The "substantial evidence" test requires a reviewing court to decide "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Banks*, 354 Md. at 68, 729 A.2d at 380 (quoting *Bulluck v. Pelham Woods Apts.*, 283 Md. 505, 512, 390 A.2d 1119, 1123 (1978)). "In applying the substantial evidence test, we have emphasized that a 'court should [not] substitute its judgment for the *expertise* of those persons who constitute the administrative agency from which the appeal is taken.'" *Anderson v. Dep't of Pub. Safety & Corr. Servs.*, 330 Md. 187, 213, 623 A.2d 198, 210 (1993) (quoting *Bullock*, 283 Md. at 513, 390 A.2d at 1124)). We also review "the agency's decision in the light most favorable to the agency, since decisions of administrative agencies are prima facie correct, … and carry with them the presumption of validity." *Anderson*, 330 Md. at 213, 623 A.2d at 210. No deference is owed, however,

11

when the local zoning board's decisions are based on an error of law. *See Loyola Coll. of Md.*, 406 Md. at 68, 956 A.2d at 174 (quoting *Belvoir Farms Homeowners Ass'n, Inc. v. North*, 355 Md. 259, 267-68, 734 A.2d 227, 232 (1999)).

## DISCUSSION

I.    **The Board Was Not Required to Consider the Standards Set Forth In HCZR §130.C in Approving Donaldson's Revised Plan**

The first question presented for our review asks whether the Board was "required to make the considerations set forth in [HCZR] 130.C[.]"  HCZR §100.A states that the zoning regulations "are being enacted for the purpose of preserving and promoting the health, safety, and welfare of the community."  Section 100.A also notes that

> It is the intention of [the Board] to guide the future growth and development of the County in accordance with the General Plan which represents the most beneficial and convenient relationships among the residential, non-residential and public areas within the County considering the suitability of each area for such uses, as indicated by existing conditions, trends in the population and modes of living, and future requirements; and considering such conditions, trends and requirements, both within the County and in relationship to areas outside thereof.

HCZR §100.A.  Pursuant to HCZR §130.B, "[t]he Hearing Authority[12] shall have the following powers related to zoning: … [t]o approve conditional uses as to location as provided in Section 131."  HCZR §130.B.5.  Additionally, HCZR §105, which governs the "RR (Rural Residential) District", also lists the various conditional uses authorized in that zoning district, including funeral homes, and states that those conditional uses are

---

[12] The term "Hearing Authority" refers to both the Board and the Hearing Examiner. *See* HCZR §130.A.2.

"subject to the detailed requirements for conditional uses given in Section 131."  HCZR §105.G.

HCZR §130.C sets forth standards the Hearing Authority must follow in considering and deciding certain matters within the scope of the HCZR.  HCZR §130.C states that

> Where in these regulations certain powers are conferred upon the Hearing Authority, or the Hearing Authority is called upon to decide certain issues, such Hearing Authority shall examine the specific property involved and the immediate neighborhood. The application shall not be approved where the Hearing Authority finds that the proposed structure, addition, extension of structure or use, use or change of use, would menace the public health, safety, security, or general welfare, or would result in dangerous traffic conditions, or would jeopardize the lives of property of people living in the neighborhood. In deciding such matters, the Hearing Authority shall give consideration, among other things, to the following:
>
> 1. The number of people residing, working or studying in the immediate areas.
> 2. Traffic conditions including facilities for pedestrians, such as sidewalks and safety zones and parking facilities and the access of cars to highways.
> 3. The orderly growth of the community.
> 4. The reasonable needs of the entire community and particular neighborhoods.
> 5. The legislative intent of these regulations as provided in Section 100.A.
> 6. The effect of odors, dust, gas, smoke, fumes, vibration, glare and noise upon the use of surrounding properties.
> 7. Facilities for sewers, water supply, solid waste collection and disposal and the ability of the County to supply such services.
> 8. Availability of fire-fighting equipment.
> 9. Decisions of the Circuit Court for Howard County and the Court of Appeals of Maryland.
> 10. The effect of such use upon the peaceful enjoyment of people in their homes.
> 11. The most appropriate use of land and structures.
> 12. The type and kind of structures in the vicinity where people are apt to gather in large numbers such as schools, churches, theaters, hospitals and the like.
> 13. The General Plan for Howard County, including, master plans for land use, highways, recreation and parks, schools, sewers, water, conservation and the like.

14. The effect of the proposed use or development on the natural, environmental or landscape resources of the site and adjacent sites, including such resources or features as historic resources, floodplains, wetlands, steep slopes and vegetation.

HZCR §131 includes specific requirements the Hearing Authority must consider to approve a conditional use. HCZR §131.A acknowledges that

Conditional uses are authorized in specified zoning districts based on the presumption that they are generally appropriate and compatible in the specified districts. However, uses in particular locations may have characteristics or impacts that are not typical. Conditional uses are not permitted automatically, but are subject to the regulations of this section and the conditions imposed by [the Board] upon approval of the proposed development.

The "General Standards Required for Approval" in HCZR §131.B state that

The Hearing Authority shall have the power to permit conditional uses, provided the following general standards are met:

1. The proposed conditional use plan will be in harmony with the land uses and policies indicated in the Howard County General Plan for the district in which it is located. In evaluating the plan under this standard, the Hearing Authority shall consider:
   a. The nature and intensity of the use, the size of the site in relation to the use, and the location of the site with respect to streets giving access to the site; and
   b. If a conditional use is combined with other conditional uses or permitted uses on a site, whether the overall intensity and scale of uses on the site is appropriate given the adequacy of proposed buffers and setbacks.
2. The proposed use at the proposed location will not have adverse effects on vicinal properties above and beyond those ordinarily associated with such uses. In evaluating the plan under this standard, the Hearing Authority shall consider whether:
   a. The impact of adverse effects such as noise, dust, fumes, odors, lighting, vibrations, hazards or other physical conditions will be greater at the subject site than it would generally be elsewhere in the zone or applicable other zones.
   b. The location, nature and height of structures, walls and fences, and the nature and extent of the landscaping on the site are such that the use

14

will not hinder or discourage the development and use of adjacent land and structures more at the subject site than it would generally in the zone or applicable other zones.

c.  Parking areas will be of adequate size for the particular use. Parking areas, loading areas, driveways and refuse areas will be properly located and screened from public roads and residential uses to minimize adverse impacts on adjacent properties.

d.  The ingress and egress drives will provide safe access with adequate sight distance, based on actual conditions, and with adequate acceleration and deceleration lanes where appropriate.

HCZR §131.N.22 specifically addresses the funeral home conditional use, and states that

A conditional use may granted in the RC, RR, R-ED or R-20 Districts for funeral homes or mortuaries provided that:

a.  The area of the lot shall be not less than three acres.
b.  The site has frontage on and direct access to a collector or arterial highway designated in the General Plan.
c.  The design of new structures or additions to existing structures will be compatible in scale and character with residential development in the vicinity, as demonstrated by architectural elevations or rendering submitted with the petition.
d.  Buildings, parking areas and outdoor activity areas will be at least 50 feet from adjoining residentially-zoned properties other than public road right-of-ways. The Hearing Authority may reduce this setback to no less than 20 feet or the minimum setback required by the zoning district, whichever is greater, if:
    (1) The adjoining land is committed to a long term institutional or open space use that provides an equivalent or better buffer for vicinal residential development; or
    (2) The petition includes detailed plans for screening, consisting of a combination of a solid fence or wall and landscaping, or an equivalent combination, that presents an attractive and effective buffer for neighboring properties.
e.  At least 20 percent of the area within the building envelope shall be green space, not used for buildings, parking area or driveways. The building envelope is formed by the required structure setbacks from property lines and public street right-of-way.
f.  Crematoriums are permitted as accessory uses to a funeral home or mortuary.

Petitioners argue that HCZR §§130.C, 131.B, and 131.N.22 should be considered a three-part scheme the Hearing Authority must consider before granting a conditional use. In contrast, Donaldson and the Board argue that HCZR §130.C is a general provision that relates to "public health, safety, security or general welfare," whereas, HCZR §131.B and §131.N.22 provide tailored standards for approving conditional uses, and specifically conditional use approval for a funeral home. Donaldson and the Board contend that it is a basic principle of statutory construction that specific provisions of an enactment control over provisions that are more general in nature; and therefore, HCZR §131 governs consideration of conditional uses, not HCZR §130.C. We agree.

It is a well-settled principle that the primary objective of statutory interpretation is "to ascertain and effectuate the intention of the legislature." *Dep't of Human Resources, Balt. City Dep't of Social Services v. Hayward*, 426 Md. 638, 649-50, 45 A.3d 224, 231 (2012) (quoting *Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d 423, 429 (1995)). We examine the plain language of the statute, and "[i]f the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written." *Id.* at 650, 45 A.3d at 231 (quoting *Jones v. State*, 336 Md. 255, 261, 647 A.2d 1204, 1206-07 (1994)). "[W]here the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts do not normally look beyond the words of the statute itself to determine legislative intent." *Id.* (quoting *Montgomery County Dep't of Social Services v. L.D.*, 349 Md. 239, 264, 707 A.2d 1331, 1343 (1998)). Additionally,

16

> [i]t is an often repeated principle that a specific statutory provision governs over a general one. Thus where one statutory provision specifically addresses a matter, and another more general statutory provision also may arguably cover the same matter, the specific statutory provision is held to be applicable and the general provision is deemed inapplicable.

*Lumberman's Mut. Cas. Co. v. Ins. Comm'r*, 302 Md. 248, 268, 487 A.2d 271, 281 (1985); *see also Dep't of Natural Res. v. France*, 277 Md. 432, 461-62, 357 A.2d 78, 94-95 (1976) ("[w]here there is a specific enactment and a general enactment, which, in its most comprehensive sense, would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment.") (citations and internal quotation marks omitted).

We have also held that "a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts." *Marzullo v. Kahl*, 366 Md. 158, 172, 783 A.2d 169, 177 (2001) (citations omitted). We conclude the standards set forth in HCZR §130.C do not govern the Hearing Authority's consideration of conditional use applications. We first note that the zoning regulation governing the RR district specifically states that the conditional uses authorized in that zone are subject to the "detailed requirements for conditional uses given in Section 131." *See* HCZR §105.G. Additionally, the plain language of HCZR §130, when read as whole, does not specifically address conditional uses, except to state that the Hearing Authority has the power "[t]o approve conditional uses as to location" pursuant to HCZR §131. *See* HCZR §130.B.5.

17

HCZR §130.C is a provision that relates generally to "public health, safety, security, or general welfare" considerations that involve a broad range of concerns; whereas, HCZR §131 specifically addresses conditional uses, and provides both general and specific standards that govern the Hearing Authority's approval of a conditional use. *See* HCZR §§131.A, 131.B, 131.N. Because we conclude that the statutory scheme does not contemplate the three-part scheme articulated by Petitioners, and because HCZR §131 is a more specific statutory provision that governs the Hearing Authority's approval of conditional uses, the Board did not err. *See Lumberman's Mut. Cas. Co.*, 302 Md. at 268, 487 A.2d at 281.

## II. *Schultz v. Pritts* "Adverse Effects" Test[13]

*Schultz v. Pritts*, 291 Md. 1, 432 A.2d 1319 (1981), is widely considered to be the bellwether case regarding conditional uses and special exceptions in the state of Maryland. *See Loyola Coll. in Md.*, 406 Md. at 87, 956 A.2d at 186; *see also Trail v. Terrapin Run, LLC*, 403 Md. 523, 551, 943 A.2d 1192, 1208 (2008) (noting that "some have called [*Schultz v. Pritts*] the seminal case in the Maryland law of special exceptions."). In *Schultz*, we concluded that our precedent

> establish[es] that a special exception use has an adverse effect and must be denied when it is determined from the facts and circumstances that the grant of the requested special exception use would result in an adverse effect upon adjoining and surrounding properties unique and different from the adverse effect that would otherwise result from the development of such a special exception use located anywhere within the zone.

---

[13] Howard County incorporated the *Schultz* test in HCZR §131.B.2, which requires the Board to determine that "[t]he proposed use at the proposed location will not have adverse effects on vicinal properties above and beyond those ordinarily associated with such uses."

18

*Schultz*, 291 Md. at 15, 432 A.2d at 1327. We held that

> the appropriate standard to be used in determining whether a requested special exception use would have an adverse effect, and therefore, should be denied is whether there are facts and circumstances that show that the particular use proposed at the particular location proposed would have any adverse effects above and beyond those inherently associated with such a special exception use irrespective of its location within the zone.

*Id.* at 22-23, 432 A.2d at 1331 (citations omitted). In *Loyola Coll. of Md.*, we clarified that the language in *Schultz* regarding "adverse effects above and beyond those inherently associated" with a conditional use is best understood in the context of the local legislature's intent. We determined that

> [t]he local legislature, when it determines to adopt or amend the text of a zoning ordinance with regard to designating various uses as allowed only by special exception in various zones, considers in the generic sense that certain adverse effects, at least in type, potentially associated with (inherent to, if you will) these uses are likely to occur wherever in the particular zone they may be located. In that sense, the local legislature puts on its 'Sorting Hat' and separates permitted uses, special exceptions, and all other uses. That is why the uses are designated special exception uses, not permitted uses. The inherent effects notwithstanding, the legislative determination necessarily is that the uses conceptually are compatible in the particular zone with otherwise permitted uses and with surrounding zones and uses already in place, provided that, at a given location, adduced evidence does not convince the body to whom the power to grant or deny individual applications is given that actual incompatibility would occur.

*Loyola Coll. in Md.*, 406 Md. at 105-06, 956 A.2d at 197-98 (footnotes omitted). We also noted the alleged adverse effects "must be more than mere annoyance[]" because by classifying such uses as special exceptions or conditional uses, the legislature assumes that those uses will include some adverse impacts. *See Mayor & Council of Rockville v. Rylyns Enterprises, Inc.*, 372 Md. 514, 542, 814 A.2d 469, 485 (2002).

19

Because special exceptions and conditional uses are legislatively-created, we have repeatedly held that "they enjoy the presumption of correctness and are an appropriate tool for the exercise of a local government's police powers." *Rylyns Enterprises, Inc.*, 272 Md. at 542-43, 814 A.2d at 486 (citations omitted); *Schultz*, 291 Md. at 11, 432 A.2d at 1325; *see also Anderson v. Sawyer* ("*Sawyer*"), 23 Md. App. 612, 617, 329 A.2d 716, 720 (1974) ("The conditional use or special exception is a part of the comprehensive zoning plan sharing the presumption that, as such, it is in the interest of the general welfare, and therefore, valid.") (citations omitted); *Mills v. Godlove*, 200 Md. App. 213, 230, 26 A.3d 1034, 1044 (2011) ("Because the allowance of a special exception use is part of a comprehensive zoning regulatory scheme that is itself accompanied by the presumption that it promotes public safety, health, and morals, it stands to reason that this broader presumption accompanying the zoning ordinance itself generates the specific presumption of compatibility associated with the inclusion in the ordinance of those uses that may be allowed through the grant of special exceptions.") (citations and internal quotation marks omitted).

Although there is a legislative presumption that a conditional use is valid, the applicant still bears "both the burden of production and the burden of persuasion on the issue of whether the [conditional use] should be granted" and must persuade the Board "'by a preponderance of the evidence that the special exception will conform to all applicable requirements.'" *See Attar v. DMS Tollgate, LLC*, 451 Md. 272, 286, 152 A.3d

20

765, 774 (2017) (quoting *Loyola Coll. in Md.*, 406 Md. at 109, 956 A.2d at 199).[14]  The

applicant is not required, however, to affirmatively establish that the proposed use will be

a benefit to the community.  *Schultz*, 291 Md. at 11, 432 A.2d at 1325; *Sawyer*, 23 Md.

App. at 617, 329 A.2d at 720 (citations omitted).  "If the applicant shows to the satisfaction

of the Board that the proposed use would be conducted without real detriment to the

neighborhood and would not actually adversely affect the public interest, he [or she] has

met his [or her] burden."  *Schultz*, 291 Md. at 11, 432 A.2d at 1325.  Any harm or

disturbance to the neighboring area and uses is material, but if there is no probative

evidence of harm or disturbance, in light of the nature of the zone involved or of factors

causing disharmony to the operation of the comprehensive plan, then a denial of the

conditional use would be arbitrary, capricious, and illegal.  *Id.*

---

[14] We also noted in *Attar* that "[w]hile an applicant for a [conditional use] bears both the burden of persuasion and of production, the concurrent presumption in favor of a [conditional use] applicant is not a mutually exclusive evidentiary burden." 451 Md. at 286, 152 A.3d at 774.  We explained, quoting the Honorable Glenn T. Harrell, Jr.'s opinion in *Anderson v. Litzenberg*, 115 Md. App. 549, 694 A.2d 150 (1997), that:

> [A] presumption does not necessarily shift the burden of persuasion. Rather, it merely satisfies the burden of going forward on a fact presumed and *may* satisfy the burden of persuasion if no rebuttal evidence is introduced by the other side. … Stated differently, the party favored by the presumption is not relieved of the requirement of presenting evidence to establish a prima facie case as to those issues for which he bears the burden of proof if the adverse party sufficiently rebuts the presumption. In such instances, the presumption merely enhances the probative value of other evidence adduced.

*Attar*, 451 Md. at 287, 152 A.2d at 774 (quoting *Litzenberg*, 115 Md. App. at 564, 694 A.2d at 157) (internal quotation marks omitted).

Thus, *Schultz* and its progeny established that if a conditional use applicant demonstrates compliance with the prescribed standards and requirements set forth in the relevant statute or regulation, then there is a presumption that the use is in the interest of the general welfare, a presumption that may only be overcome by probative evidence of unique adverse effects. Absent such probative evidence, it is arbitrary, capricious, and illegal for the Board to deny the conditional use application. *See Schultz*, 291 Md. at 15, 22-23, 432 A.2d at 1327, 1331 (citations omitted).

## A. The Board Is Not Required to Identify the "Ordinary or Inherent Adverse Effects" of a Funeral Home

The second question presented for our review asks whether the Board satisfied the *Schultz* "adverse effects" test "when it failed to conduct an analysis based on the 'ordinary or inherent adverse effects' of a [f]uneral [h]ome[.]" Petitioners argue that to satisfy the "adverse effects" test in *Schultz*, the Board was required to determine what the ordinary or inherent adverse effects of a funeral home were. In support of this view, Petitioners rely on the decision in *Mills v. Godlove*,[15] where the Court of Special Appeals concluded that the zoning board "did not sufficiently discuss the adverse effects above and beyond those inherently associated with a storage yard." 200 Md. App. at 239, 26 A.3d at 1049.

---

[15] In *Mills*, the applicants sought a special exception and variance allowing them to continue to park paving equipment on their property, which they had been doing for seven years prior to filing the application without issue. 200 Md. App. at 217-18, 26 A.3d at 1036-37. The zoning board initially approved the application, but on judicial review the circuit court reversed the board, concluding that the board's findings were insufficient. *Id.* at 220-21, 26 A.3d at 1037-38. On remand, the board again approved the applicants' application, but on judicial review, the circuit court again reversed the board, holding that there was insufficient analysis of the inherent adverse effects associated with an equipment storage yard. *Id.* at 222-23, 26 A.3d at 1039.

22

Petitioners contend that the case at bar is analogous to *Mills* because the Board did not identify or determine what the ordinary or inherent adverse effects of a funeral home might be. Instead, Petitioners argue that the Board merely offered the general premise that it "begin[s] with the realization that virtually every human activity has the potential for adverse impact. Zoning recognizes this fact and, when concerned with conditional uses, accepts some level of such impact in light of the beneficial purposes the zoning body has determined to be inherent in the use." Petitioners acknowledge, however, that the Board considered "noise, dust, fumes, odors, lighting, vibrations, hazards or other physical conditions" as "potential adverse impacts."

In contrast, Donaldson argues that the Board properly considered the adverse impact of the proposed funeral home, including evaluation of: (1) the noise, dust, odors, lighting, vibrations, and fumes; (2) the adverse environmental impact; (3) the adverse impact related to cultural sensitivities; (4) the adverse impact related to structures, walls, and fences; (5) the adverse impact related to parking areas, loading areas, driveways, and refuse areas; and (6) the adverse traffic impacts. *See* HCZR §131.B.

Donaldson also contends that *Mills* was not intended to create a formulaic approach that required the Board to first identify all of the adverse impacts generally associated with a funeral home and then systematically deconstruct or refute such adverse impacts to arrive at the Board's ultimate conclusion. Instead, Donaldson argues the Court's holding in *Mills* was based on its assessment that the zoning board's conclusions "were insufficient because it merely presented conclusions without pointing to any evidentiary basis." 200 Md. App. at 236, 26 A.3d at 1048. Donaldson avers that the purpose behind requiring detailed

23

findings of fact and conclusions of law in the decisions and orders of an administrative agency is to permit a party to the proceedings "to be apprised of the facts relied upon by the agency in reaching its decision" and to "permit meaningful judicial review of those findings." *Harford County v. Earl E. Preston, Jr.*, 322 Md. 493, 505, 588 A.2d 772, 778 (1991). Donaldson argues that ultimately, the test is whether the Board's decision regarding adverse impacts was carefully evaluated and sufficient to permit meaningful judicial review, which it contends, the Board did. We agree.

In *Schultz*, we recognized that in designating a conditional use, the local legislature "considers the variety of possible uses available, examines the impact of uses upon the various purposes of the zoning ordinance, determines which uses are compatible with each other and can share reciprocal benefits, and decides which uses will provide for coordinated, adjusted, and harmonious development of the district." *Schultz*, 291 Md. at 22, 432 A.2d at 1330. Based on this balancing process,

> when the legislative body determines that the beneficial purposes that certain uses serve outweigh their possible adverse effect, such uses are designated as permitted uses and may be developed even though a particular permitted use at the particular location proposed would have an adverse effect above and beyond that ordinarily associated with such uses.
>
> \*　　\*　　\*
>
> When the legislative body determines that other uses are compatible with the permitted uses in a use district, but that the beneficial purposes such other uses serve do not outweigh their possible adverse effect, such uses are designated as conditional or special exception uses. Such uses cannot be developed if at the particular location proposed they have an adverse effect above and beyond that ordinarily associated with such uses.

*Id.*, 432 A.2d at 1330-31 (citations omitted); *see also Loyola Coll. in Md.*, 406 Md. at 106, 956 A.2d at 197. Additionally, in *Sawyer*, the Court of Special Appeals concluded that

24

The presumption that the general welfare is promoted by allowing funeral homes in a residential use district, notwithstanding their inherent depressing effects, cannot be overcome unless there are strong and substantial existing facts or circumstances showing that the particularized proposed use has detrimental effects above and beyond the inherent ones ordinarily associated with such uses[.]

23 Md. App. at 624-25, 329 A.2d at 724. The *Sawyer* Court also observed that:

[A]n undertaking business has an inherent depressing and disturbing psychological effect which may adversely affect persons residing in the immediate neighborhood in the enjoyment of their homes and which may lessen the values thereof. Indeed, it is precisely because of such inherent deleterious effects that the action of a local legislature in prohibiting such uses in a given zone or zones will be regarded as promoting the general welfare and as constitutionally sound.

*Id.*

Because the Howard County Council, in their capacity as a legislative body, already undertook an assessment of the adverse effects inherent in a funeral home, and determined that a funeral home is sufficiently compatible with the permitted uses in the RR-DEO zone to authorize it as a conditional use, subject to the requirements contained in HCZR §131.B and §131.N.22, it was not necessary for the Board to specify what adverse effects were inherent in a funeral home before approving the Revised Plan.[16]

------

[16] Further reinforcing this position, the Board concluded in its Decision and Order that

Evidence was produced before the Board indicating that legislation had been proposed to remove the funeral home and mortuary conditional use from the RR-DEO zoning district. [The Board] and DPZ, however, recommended against such removal, and the legislation was not enacted. These actions by agencies charged with planning responsibilities for the County confirm that funeral homes and mortuaries are important in the County's RR-DEO zoning district and are consistent with the policy goals of the General Plan.

(continued . . .)

In *Mills*, the Court of Special Appeals reversed a zoning board's approval of the special exception because the Court concluded the board "made conclusions that were not supported by sufficient factual predicate and analysis." The Court noted that

> the Zoning Board did not address the adverse effects of storing contractor's equipment, nor did it address how appellants' storage of paving equipment would be different. The Zoning Board should have fleshed out any adverse effects appellants' use would have had on the neighborhood, and determined whether those effects were above and beyond those inherently associated with storing paving equipment. The Zoning Board, moreover, did not discuss the neighborhood, provide an in depth analysis of the effect storing paving equipment would have on the neighborhood, or anything else when it concluded that the proposed use was of low intensity and compatible with the neighborhood. Likewise, the Zoning Board merely stated, without support, that there was no evidence in support of the notion that the "proposed use was incompatible with the neighborhood; disruptive of neighbors' quiet enjoyment of their properties; detrimental to surrounding property values; generative of excessive odors, dust, gas, smoke, fumes, vibrations, or glare; generative of traffic that would exceed the capacity of existing infrastructure; or that the proposal was inappropriate use of land or structure."

200 Md. App. at 239, 24 A.3d at 1049-50. As discussed more fully, *infra*, the Board presented sufficient factual findings in its Decision and Order to support its conclusion that the proposed funeral home would not present any adverse impact above and beyond those effects inherently associated with a funeral home, irrespective of its location. The Court's decision in *Mills* regarding adverse effects is therefore inapposite and has no bearing on our decision.

---

(. . . continued)

Thus, the record reflects our determination that the Howard County Council has weighed the inherent adverse effects of funeral homes against permitted uses in the RR-DEO zone and determined that the adverse impacts are sufficiently compatible with the permitted uses to continue to allow funeral homes as a conditional use.

26

## B. Asian Community's Cultural Aversion to the Death Industry

The third question presented for our review asks whether the Board satisfied the *Schultz* "adverse effects" test "when it approved the [f]uneral [h]ome in spite of the surrounding Asian community's deep-seated cultural aversion to the death industry[.]" Petitioners argue that "a [f]uneral [h]ome use will have an atypically adverse, disruptive effect on the health, safety and welfare of the residential community because of its Asian residents' strong cultural aversion to the death industry." Petitioners also contend that the Board erred in concluding that HCZR §131.B allowed the Hearing Authority to only consider "physical conditions" because, in Petitioners' view, HCZR §131.B.2.a's required considerations of "noise, dust, fumes, odors, lighting, vibrations, hazards or other physical conditions" are the minimum considerations the Board must address in approving or denying a conditional use, not the maximum. Because Petitioners interpret the enumerated considerations contained in HCZR §131.B.2.a to constitute a minimum set of considerations, they argue the Board "erroneously discounted the cultural sensitivity issue as 'not a physical condition' and therefore not an adverse effect to be considered." In further support of their view, Petitioners also note that HCZR §131.A states that "particular uses in particular locations may have characteristics or impacts that are not typical." Petitioners contend that the Hearing Authority cannot address atypical "characteristics or impacts" if it limits its inquiry to the boilerplate "physical" considerations enumerated in HCZR §131.B.2.a.

Petitioners also rely on language in HCZR §100.A, stating that the legislative intent of the HCZR is to "preserv[e] and promot[e] the health, safety, and welfare of the

27

community." Petitioners argue that health is not solely impacted by physical conditions, and that the "extraordinary adverse effect on the mental health of the Asian community not only may be considered, but *must* be considered in light of the testimony and evidence before the Board." Petitioners aver the Board should have compared the adverse effects of the funeral home at the proposed location with the ordinary or inherent effects of a funeral home, including the depressive effects acknowledged in *Sawyer*.

Donaldson and the Board both argue that because cultural sensitivities are not a "physical condition", it would be impossible for Donaldson to prove the proposed funeral home would not offend a particular person or group of people. Donaldson contends that Petitioners' view would require it to somehow know about and consider the "heightened, extraordinary hypersensitivities of nearby residents, even though Donaldson (and any other conditional use applicant) would never be able to prove that a particular use would not offend a particular person or group of people, who … claim a heightened aversion to such use." Donaldson also argues it is unaware of any Maryland case addressing whether a resident's subjective hypersensitivity is a permissible factor to consider as part of the *Schultz* test.

Donaldson analogizes the issue at bar to the law of nuisance,[17] arguing that, like in the law of nuisance, an objective standard should be applied to the *Schultz* test because it

---

[17] Donaldson cites the United States Supreme Court case *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S. Ct. 114 (1926), where the Supreme Court expressly called for consultation to nuisance law when helpful to understand the scope of the police power underlying zoning laws:

(continued . . .)

28

would allow the conditional use applicant, in evaluating a particular property, "to determine whether those normal effects might be above and beyond those ordinarily associated with the use and to mitigate any such effects to the fullest extent possible." Donaldson contends that if a subjective requirement – like cultural sensitivity – was applicable, a conditional use applicant would not be able, and cannot be expected, to plan for and mitigate impacts that might arise due to a property owner's unknowable hypersensitivities.

The Board and Donaldson also argue that, even if cultural sensitivities were a valid consideration pursuant to the *Schultz* "adverse effects" test, the Board properly concluded that under the "totality of the evidence," the proposed use will not create an adverse impact on vicinal properties above and beyond those ordinarily associated with a funeral home. Donaldson acknowledges that testimony was presented regarding the cultural aversion to

---

(. . . continued)

> The ordinance now under review, and all similar laws and regulations, must find their justification in some aspect of the police power, asserted for the public welfare. The line which in this field separates the legitimate from the illegitimate assumption of power is not capable of precise delimitation. It varies with circumstances and conditions. A regulatory zoning ordinance, which would be clearly valid as applied to the great cities, might be clearly invalid as applied to rural communities. In solving doubts, the maxim [*sic utere tuo ut alienum non laedas*], which lies at the foundation of so much of the common law of nuisances, ordinarily will furnish a fairly helpful clew. And the law of nuisances, likewise, may be consulted, not for the purpose of controlling, but for the helpful aid of its analogies in the process of ascertaining the scope of, the power.

*Id.* at 387-88, 47 S. Ct. at 118; *see also Ray v. Mayor of Baltimore*, 430 Md. 74, 82, 94, 59 A.3d 545, 549, 557 (2013) (noting the law of nuisance "is the historical roots of zoning[.]").

29

the death industry by some members of the Asian community, but argues it presented ample

rebuttal testimony, and notes the Board's Decision and Order contained factual findings

that were derived from testimony produced by both Donaldson and the Petitioners.

Donaldson and the Board contend that while Petitioners may disagree with how the Board

weighed the evidence and reached its conclusion, the evidence presented by Donaldson

was sufficient to support the Board's conclusion that the proposed use would not adversely

affect vicinal properties.

We ordinarily give an administrative agency's interpretation and application of the

statute which the agency administers considerable weight. *See Banks*, 354 Md. at 69, 729

A.2d at 381. As noted, *supra,* HCZR §131.B.2.a states

> 2. The proposed use at the proposed location will not have adverse effects
>    on vicinal properties above and beyond those ordinarily associated with
>    such uses. In evaluating the plan under this standard, the Hearing
>    Authority shall consider whether:
>
>    a. The impact of adverse effects such as noise, dust, fumes, odors,
>       lighting, vibrations, hazards or other physical conditions will be
>       greater at the subject site than it would generally be elsewhere in the
>       zone or applicable other zones.

In the case at bar, the Board concluded in its Decision and Order that

> the cultural sensitivities testified to by various [Petitioners] is not a "physical
> condition" to be considered pursuant to [HCZR] Section 131.B.2.a. Even if
> it were a relevant consideration, the Board considered the totality of the
> evidence presented in this case and is not persuaded that the proposed use
> will create an adverse cultural impact on vicinal properties or that such
> impact will be above and beyond those ordinarily associated with funeral
> home and mortuary uses in the RR-DEO zoning district.

We conclude that the Board did not err in determining that HCZR §131.B, incorporating

the *Schultz* "adverse effects" test, only required it to consider the enumerated

30

considerations contained in the regulation because the plain language of the regulation supports that finding and we will defer to the Board's interpretation of its own regulation. *See Banks*, 354 Md. at 69, 729 A.2d at 381. We further conclude that because the *Schultz* "adverse effects" test exists within a county's regulatory scheme governing conditional uses, Petitioners were required to demonstrate a substantial nexus between their assertion of a "cultural aversion to the death industry" and the enumerated considerations in HCZR §131.B.2.a. of "noise, dust, fumes, odors, lighting, vibrations, hazards or other physical conditions." Because the community members failed to present substantial evidence connecting their "cultural sensitivities" to any of the enumerated conditions contained in HCZR §131.B.2.a, [18] we conclude the Board did not err.

---

[18] The record reflects that multiple community members testified regarding their cultural aversions to the proposed funeral home. For example, Peter Li shared a story about Confucius, told to him as a child, whereby:

> Confucius' mother relocate[ed Confucius] three times. So first his family lived next to a butcher store. And the young Confucius picked up very quickly all the skill set for a butcher. And the mother noticed his narrow focus on things that violent, so immediately moved the family to another location, this time next to a funeral home. And the young Confucius now became fascinated with playing the sad music and mimicking the weeping and crying. One thing I do want to share with the Board member here is that Chinese…when Chinese go to funeral, they are actually encouraged to express their emotion openly. So you do see a lot of crying and weeping in the ceremony like that. So it's somewhat different. All we hear is more sad, calm, but you don't really see the open bursts of emotion. So when…when the mother noticed that young Confucius became fascinated with playing the sad music and all that weeping and all that, the mother moved the family away again because she doesn't really want the son to have that depressing aspect of the nature. And this time they moved right next to a well respected school. And then after moving, the young man now basically lost the focus on the violence or deaths or depressing nature of side of it and got very deeply

(continued . . . )

(. . . continued)

into academic learning and family basically after that stay. And we all know now that Confucius is revered for his teaching on family value, education, and giving back to society. Many of our Asian people here in opposition to proposed funeral home have moved to this area for this sense of community and the environment that allows our children to focus on positives like education and then to avoid the negatives we associate with end of the life.

Marianne Lee testified that,

I think the main reason I've already stated and the Board has already heard which is really significant fact personally for me and having spoken with other of my Asian neighbors is that you just, I personally would not want to live near a funeral home. And it has to do with a cultural reasoning.

I came here when I was six years old and my husband was born here. But we both grew up in the Korean American tradition and have assimilated here but yet maintained traditions with one of them being that you don't live near a funeral home, a cemetery or things related to death. And I don't want to bore the Board but I do want to somewhat, I guess, shed light on the issue as to why there's such a big brouhaha in the Asian community about funeral homes which predates, well just the historical, particularly with the Korean Community, the Buddhist history.

That within your body you have a soul and a spirit and when you die the spirit exits. And that there is good and bad spirits and the bad spirits will then haunt the adjoining properties or properties further down. And so therefore in Korea there are no funeral homes, there are no cemeteries in any residential areas. In fact, those of my family members who are Korean are either cremated and their ashes are thrown in the mountain or the ocean. Or they are buried in a further site, generally in the countryside or in mountains.

And similarly that tradition has been carried over. And having talked with my neighbors I think this is pretty much the similar reasoning for the Chinese Community and the Indian Community. I think the Chinese Community describes it as a feng shui. And the Indian Community is something called vastu which is essentially that a bad omen, that bad luck, well I don't want to say luck, but a bad omen, that a bad thing would happen to you.

(continued . . .)

(. . . continued)

Shun Lu explained to the Board that

> We are more sensitive to this because we feel very sad and depressed if we see like dead person and funeral home and we just don't live close to a funeral home, and this is something we cannot fix. We cannot handle. So, that's why a lot of people here and a lot of people from the Asian population have suffered from depression.
>
> \* \* \*
>
> From, you know, ever since our childhood and, you know, we just, you know, feel our family and – we just cannot live close to a funeral home in our culture. We feel it's bad luck to be so close to a funeral home. And our culture emphasize balance. You do not put a funeral home right amid this residential areas that mingle with so many people's daily life. And we feel that's not proper.

Grace Chi stated that,

> Every time since then I pass a funeral home it remind me of my father and my grandma. It bring back the *unintelligible*. It's unbearable.
>
> If the facility is allowed to be built across from my backyard it will be a constant reminder of the deaths of my father and my grandma and all sinners. My bedroom, kitchen, breakfast room, family room, study, sunroom, all face that proposed site of the funeral home.
>
> In addition, if I am in the backyard I will not only see people coming to that facility, I will also hear them. I have no objection to them because I know they have lost their loved one. And I can fully relate to them and their feeling. It is so painful to say the final goodbye.
>
> How am I going to enjoy even my back yard or my house. I and my husband, we are both first generation immigrants. We just invested all our life saving, working hard in the United States, to purchase the current home without knowing Donaldson's plan. We like Clarksville because of the beautiful rural surrounding. And we would like to retire there. It is our American dream. However, for all the reasons I just mentioned our dream will be ruined.
>
> \* \* \*

33

Additionally, as discussed *supra*, the Howard County Council, in approving funeral homes as a conditional use, already balanced the impact a funeral home would have on the general welfare and whether the use was compatible with the permitted uses in the RR-DEO zone. *See Loyola Coll. in Md.*, 406 Md. at 106, 956 A.2d at 198; *Schultz*, 291 Md. at 11, 432 A.2d at 1325. The Board was not required, therefore, to consider the language contained in HCZR §100.A, unless Petitioners presented evidence of a unique adverse effect to a "physical condition[,]" which they did not do.

Accordingly, we conclude that because the community members did not provide a substantial nexus between their "cultural aversion to the death industry" and the enumerated considerations the Board was required to consider in HCZR §131.B.2.a, the Board did not err in concluding that the Revised Plan would not "create an adverse cultural impact on vicinal properties or that such impact will be above and beyond those ordinarily associated with funeral home and mortuary uses in the RR-DEO zoning district."

### C. Removal of Natural Forest from Tier II Stream to Accommodate Funeral Home Construction

Finally, the fourth question presented for our review asks whether the Board satisfied the *Schultz* "adverse effects" test "when it approved the removal of a natural forest along a Tier II stream to accommodate construction of the [f]uneral [h]ome[.]" Petitioners argue the Board erroneously approved the Revised Plan even though, according to Petitioners, the Revised Plan would remove a significant swath of the Property's naturally wooded riparian buffer. In support of its allegation that the Revised Plan calls for deforestation, Petitioners note that the Revised Plan shows fifty feet of natural forest on

the western edge of the Property, whereas the preexisting naturally forested stream buffer shown in Donaldson's aerial map showed a width of 100 feet or more.[19] Petitioners aver the Board never acknowledged that the Revised Plan contemplated the removal of natural forest from the riparian buffer in its Decision and Order.

As both the Board and Donaldson argue, Petitioners' allegation is without merit. In its Decision and Order, the Board noted that "Mr. Vogel testified that the purpose of the 100 foot buffer was to protect the stream[;]" and Mr. Burchick testified that "the stream buffer would be 100 feet from the unnamed tributary located at the northwest corner of the Property." Based on this testimony, the Board concluded that

> the Plan complies with all legally imposed stream buffer requirements. [Petitioners] presented no credible testimony that the stream buffer would be increased, or that adverse impacts would occur to the stream irrespective of the Petitioner's adherence to the legally imposed buffer. [Donaldson's] witnesses, on the other hand, testified that the proposed use as shown on the Plan would not result in adverse impacts on the stream.

---

[19] The Board posits that the basis for Petitioners' allegation is a misreading of the aerial map, which only shows legally defined "natural forest" not all the trees that are on the Property. Mr. Burchick testified that

> The legal definition of a forest is that you have to have 100 trees per acre …. We never had to have 100 trees per acre…. So for the purposes of a forest stand delineation, we never had a forest. We did have specimen trees that were 30 inches and larger but we didn't have canopy closure and we never met the criteria …. Most of the trees there are ornamental, not native trees, that were part of the previous homeowner's landscape.

The Board contends the aerial map did not show additional trees on the Property because those trees were not part of the natural forest, but their exclusion did not mean Donaldson intended to remove such trees or encroach on the 100-foot buffer.

35

Nothing in the record reflects that Donaldson proposed to clear fifty feet of forested stream buffer in order to develop the funeral home. Because there is no indication from the record that Donaldson intends to remove trees from the stream buffer, Petitioners allegations that the Board failed to consider such action is without merit.

**CONCLUSION**

In summary, we hold that the Board properly analyzed Donaldson's Revised Plan pursuant to the specific statutory requirements contained in HCZR §131.B and §131.N.22 and was not required to consider the standards contained in the more general regulation HCZR §130.C. We also hold that the *Schultz v. Pritts* "adverse effects" test does not require the Board to initially determine what the inherent or ordinary adverse effects in a conditional use are because those adverse effects were previously identified and weighed by the local legislature in deciding whether the use is compatible with other permitted uses within a given zone.

We also hold that the Board properly concluded that the evidence of "cultural sensitivit[y]" was not sufficient relative to a denial of Donaldson's conditional use because the testimony provided by several members of the Asian community, explaining their "cultural aversion to the death industry[,]" failed to provide a substantial nexus between their "cultural sensitivities" and the conditions the Board was required to consider in deciding to grant or deny a conditional use. *See* HCZR §131.B. Absent a substantial nexus between the community members' assertion of a "cultural aversion to the death industry" and the enumerated considerations the Board was required to consider in HCZR §131.B, the Board did not err in concluding that the Revised Plan would not "create an adverse

36

cultural impact on vicinal properties or that such impact will be above and beyond those ordinarily associated with funeral home and mortuary uses in the RR-DEO zoning district." Finally, we conclude there is no merit to Petitioners' argument that the Board ignored Donaldson's alleged intent to remove fifty feet of trees from the stream buffer because there is no evidence Donaldson proposed to do so, and substantial evidence in the record supports the Board's conclusion that the Revised Plan contemplates a 100-foot stream buffer in compliance with State requirements.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**

Circuit Court for Howard County
Case No. 13-C-13-095806

Argued: March 6, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 70

September Term, 2016

_____

CLARKSVILLE RESIDENTS AGAINST
MORTUARY DEFENSE FUND, INC. et al.

v.

DONALDSON PROPERTIES et al.

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Concurring Opinion by Watts, J.

_____

Filed: June 22, 2017

Respectfully, I concur. I am in accord with the outcome reached by the majority opinion. I write separately, however, to explain my reasons for agreeing that an impact on a community's cultural sensitivities may be considered under Howard County Zoning Regulation ("HCZR") (2012) § 131.B.2.a.[1] I agree with the majority opinion's discussion on cultural sensitivities, see Maj. Slip Op. at 27-34, and its conclusion that

> because the community members did not provide a substantial nexus between their "cultural aversion to the death industry" and the enumerated considerations the Board was required to consider in HCZR §131.B.2.a, the Board did not err in concluding that the Revised Plan would not "create an adverse cultural impact on vicinal properties or that such impact will be above and beyond those ordinarily associated with funeral home and mortuary uses in the RR-DEO zoning district."

Maj. Slip Op. at 34. In other words, I agree with the Majority's holding, but I write separately to describe, from my perspective, the "substantial nexus" necessary to have an alleged impact on cultural sensitivities considered under HCZR (2012) § 131.B.2.a.

I would hold that, under a plain reading of HCZR (2012) § 131.B.2.a, if the impact of adverse effects such as noise, dust, fumes, odors, lighting, vibrations, hazards or other physical conditions—*i.e.*, the impact of adverse effects of the type identified in HCZR (2012) § 131.B.2.a—bears on a particular community's cultural sensitivities and the impact of those adverse effects will be greater at the subject site than it generally would be elsewhere due to the community's cultural sensitivities then the Hearing Authority must

---

[1]As the majority opinion notes, in 2013, the Howard County Council adopted the current version of the HCZR. See Maj. Slip Op. at 9 n.11. As a result of revisions, what was HCZR (2012) § 131.B.2.a is now HCZR § 131.B.3.a, which is substantively identical to the prior version of the regulation. However, because the Board considered the Revised Plan in 2012, I, like the majority opinion, will refer to the HCZR as it existed at that time.

consider the community's cultural sensitivities in determining whether to permit the proposed conditional use.  In other words, where, due to a community's cultural sensitivities, the impact of adverse effects of factors such as noise, fumes, et cetera, is greater at the subject site than it generally would be elsewhere, the Hearing Authority may not discard the impact on the community's cultural sensitivities in determining whether the proposed use will have an adverse effect on vicinal properties above those ordinarily associated with such uses.

HCZR (2012) § 131.B set forth the general standards required for approval of a conditional use and stated, among other things, the following:

> The Hearing Authority shall have the power to permit conditional uses, provided the following general standards are met:
>
> . . .
>
> 2. The proposed use at the proposed location will not have adverse effects on vicinal properties above and beyond those ordinarily associated with such uses.  In evaluating the plan under this standard, the Hearing Authority shall consider whether:
>
>> a. The impact of adverse effects such as noise, dust, fumes, odors, lighting, vibrations, hazards or other physical conditions will be greater at the subject site than it would generally be elsewhere in the zone or applicable other zones.

The plain language of HCZR (2012) § 131.B.2.a requires the Hearing Authority to consider the impact of adverse effects and whether the adverse effects would be above and beyond those ordinarily associated with the proposed use, *i.e.*, a conditional use.

Significantly, the question before the Court is not whether cultural sensitivities is one of the factors or conditions to be considered under HCZR (2012) § 131.B.2.a.  Stated

otherwise, the question is not whether cultural sensitivities is an identified or proper factor for consideration—*i.e.*, an adverse effect in and of itself—akin to noise, dust, fumes, odors, lighting, vibrations, hazards, and other physical conditions.  Rather, the question is whether the impact of factors such as noise, dust, fumes, odors, lighting, vibrations, hazards, or other physical conditions will have an adverse effect on vicinal properties above and beyond those ordinarily associated with the proposed conditional use.  This includes consideration of whether an adverse impact is greater due to cultural sensitivities where such evidence is presented before the Hearing Authority.

HCZR (2012) § 131.B.2.a does not limit the Hearing Authority to merely concluding or determining whether there will be an adverse effect of a physical type.  Indeed, it is evident that HCZR (2012) § 131.B.2.a's provision that the "impact of adverse effects" be considered is not limited to simply considering whether there is noise or not, or whether there are fumes or not.  Instead, consideration of the "impact of adverse effects" must be taken into account.  Under a plain reading of HCZR (2012) § 131.B.2.a, if the impact of adverse effects such as noise or fumes— *i.e.*, the type of adverse effects identified in HCZR (2012) § 131.B.2.a—bears on a particular community's cultural sensitivities and the impact will be greater at the subject site due to those sensitivities, then the Hearing Authority must consider the impact on the community's cultural sensitivities in determining whether to permit the proposed conditional use.  Importantly, holding as much would not preclude the Hearing Authority from considering the impact of physical conditions on vicinal properties or otherwise limit or expand what the Hearing Authority may consider as an impact.

In this case, in agreement with the Majority, I would conclude that Petitioners did not present evidence of repercussions to their cultural sensitivities in accord with HCZR (2012) § 131.B.2.a because they failed to tie the alleged affront to their cultural sensitivities to the impact of adverse effects such as noise, dust, fumes, odors, lighting, vibrations, hazards or other physical conditions. Here, as the majority opinion recounts, some members of the community testified generally about the deep-seated cultural aversion to the death industry that certain Asian cultures have and that they generally were opposed to having a funeral home located so close to their residences. See Maj. Slip Op. at 31-33 n.18. Those community members, however, failed to provide any indication that untoward noises, dust, fumes, odors, lighting, vibrations, hazards, or other physical conditions would have any consequence at all to their cultural sensitivities, let alone a greater impact at the subject site due to their cultural sensitivities such that the Hearing Authority should have considered as much when determining whether to permit the conditional use. For example, had the community members testified that their cultural sensitivities would be impacted due to the circumstance that they would be able to detect untoward odors emanating from the funeral home, and that the impact at the subject site was greater than it would be elsewhere, then the Hearing Authority would necessarily have needed to consider such an impact under HCZR (2012) § 131.B.2.a. However, as stated, the community members in this case testified only to a general opposition and dislike to residing near a funeral home.

Accordingly, I agree with the majority opinion's discussion on cultural sensitivities, see Maj. Slip Op. at 27-34, and its determination that the community members did not provide a substantial nexus between their "cultural aversion to the death industry" and the

- 4 -

enumerated considerations the Board was required to consider in HCZR §131.B.2.a.  Maj. Slip Op. at 34.  I write separately to define, from my view, the "substantial nexus" required for an alleged impact on cultural sensitivities to be considered under HCZR (2012) § 131.B.2.a.

For the above reasons, respectfully, I concur.